### USED EQUIPMENT SALES, INC., Petitioner,

v.

### DEPARTMENT OF TRANSPORTATION; Federal Highway Administration; Federico F. Pena, Secretary of Transportation, Respondents.

No. 93–1675.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 2, 1994.

Decided May 23, 1995.

William E. Kenworthy, Washington, DC, argued the cause and filed the briefs for petitioner.

Edward Himmelfarb, Attorney, Dept. of Justice, Washington, DC, argued the cause for respondents. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., and Freddi Lipstein, Attorney, Dept. of Justice, Washington, DC. Anthony J. Steinmeyer, Washington, DC, entered an appearance for respondents.

Before BUCKLEY, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Used Equipment Sales, Inc., a motor carrier regulated under the Motor Carrier Safety Act of 1984, petitions for review in part of an order of the Federal Highway Administration determining that Used Equipment committed numerous violations of the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 391, *et seq.*, and assessing penalties therefor. We hold that the FHWA did not err in imposing upon the petitioner 13 separate fines under 49 U.S.C. § 521(b)(2)(A) for 13 times dispatching disqualified drivers, in violation of 49 C.F.R. § 391.15, but that it lacked sufficient evidence to conclude that three of the violations of § 391.15 constituted "substantial health or safety violation[s]."

## I. BACKGROUND

The FHWA charged that Used Equipment committed 32 violations of the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 391, *et seq.* Thirteen of those violations were predicated upon 13 separate dispatches involving three drivers whose licenses had been suspended. *See* 49 C.F.R. § 391.15(a) ("a motor carrier shall not ... permit a driver who is disqualified to drive a commercial motor vehicle"). An Administrative Law Judge held that each of the 13 dispatches constituted a separate "substantial health or safety violation ... which could reasonably lead to ... serious personal injury or death" within the meaning of 49 U.S.C. § 521(b)(2)(A), and assessed a separate fine for each violation. Used Equipment appealed, but the Associate Administrator for Motor Carriers affirmed the decision of the ALJ.

Used Equipment now petitions for review of that portion of the Final Order in which the FHWA imposed civil penalties for the dispatch of disqualified drivers. It advances three arguments: first, that the 13 separate fines constitute "cumulative daily penalties" for violations of 49 C.F.R. § 391.15 and that

such penalties are not permitted by § 521(b)(2)(A); second, that with respect to one of the drivers the ALJ's finding that it "should have known" of the disqualification is not supported by substantial evidence; and third, that the dispatch of that driver could not constitute a "substantial health or safety violation" in the absence of evidence showing that his license had been suspended for a health- or safety-related reason.

## II. ANALYSIS

The FHWA may assess a civil penalty against a motor carrier under any of three separate provisions of 49 U.S.C. § 521(b)(2)(A). First, for violation(s) of a "recordkeeping requirement," the agency may assess a penalty of up to $500 for each offense, where "[e]very day of a violation ... constitute[s] a separate offense." Second, for a "serious pattern of safety violations, other than recordkeeping requirements," the agency may assess a fine of up to $1,000 for each offense, up to a total of $10,000 for all offenses in the pattern. Finally, for "a substantial health or safety violation ... which could reasonably lead to ... serious personal injury or death," the agency may assess a penalty "not to exceed $10,000 for each offense." Although the fines challenged by Used Equipment were all imposed under the third provision, as will be seen below an understanding of the other provisions and of the structure of the penalty section of the statute is relevant to the petitioner's arguments.

### A. The Thirteen Violations

Used Equipment argues first that the FHWA erred in charging a separate violation of 49 U.S.C. § 521(b)(2)(A) for each violation of 49 C.F.R. § 391.15. Characterizing the FHWA's imposition of 13 "substantial health or safety violations" predicated upon 13 violations of § 391.15 as "cumulative daily penalties," the petitioner contends that "in the absence of express authority, per diem penalties may not be imposed." Moreover, because 49 U.S.C. § 521(b)(2)(A) specifically provides that "each day" of a recordkeeping offense is a separate violation but makes no similar provision for a "substantial health or

safety violation," Used Equipment urges that the Congress "explicitly withheld the right to charge per diem penalties for offenses that did not involve recordkeeping." The petitioner also cites a number of cases for the proposition that there is a presumption against the imposition of cumulative penalties for a continuing offense. *See, e.g., Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (auto theft conviction for ninth day of nine-day joyride improper where defendant also convicted based upon first day of theft); *United States v. Bennett,* 623 F.2d 52 (8th Cir.1980) (striking down two of three convictions for operating gambling business for three consecutive days).

Used Equipment's argument mischaracterizes the FHWA's decision. The FHWA did not impose "cumulative daily penalties" because it did not impose a fine for each day that a disqualified driver was on the road. Instead, as is clear from the ALJ's decision, which the agency affirmed and adopted, the FHWA imposed a fine for each time the petitioners dispatched a driver who was disqualified.

 In another line of attack upon the 13 fines, Used Equipment first makes much of the fact that § 521(b)(2)(A) does not provide in terms that each dispatch may be regarded as a separate violation. It then goes on to argue that "even if the statute authorized such treatment, there is no evidence in the record as to the number of occasions upon which each driver was 'dispatched.'"

Taking up the legal point first, we review the FHWA's interpretation of the statute it administers under the familiar teaching of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As the Congress has not "directly spoken to the precise question" whether each dispatch of a disqualified driver is a separate "substantial health or safety violation," we will defer to the FHWA's interpretation if it is reasonable in light of the text, the structure, and the underlying purpose of § 521(b)(2)(A). *Id.* at 842–43, 104 S.Ct. at 2781–82; *see also American Water Works Ass'n v. E.P.A.,* 40 F.3d 1266, 1270 (D.C.Cir.1994).

We hold that the FHWA's interpretation of § 521(b)(2)(A), making each separate act of a motor carrier in violation of an FHWA regulation—here each dispatch of a disqualified driver—a separate "health or safety violation" is entirely reasonable. First, as the ALJ observed, the provision of a separate penalty for "each" offense suggests that "multiple penalties are recoverable for a multiplicity of occurrences." More substantively, the FHWA argues that its interpretation advances the purpose of the Motor Carrier Safety Act to ensure "increased compliance with commercial motor vehicle safety and health regulations," *see* 49 U.S.C. § 31131(a)(3), by deterring a motor carrier that has once dispatched a disqualified driver from doing so again. The petitioner's interpretation of § 521(b)(2)(A), in contrast, would provide no such marginal incentive for a motor carrier that has already dispatched a disqualified driver. That would be analogous, as the agency points out, to the Congress providing that "a person who committed six bank robberies ... on six different dates ... committed a single offense." Absent a clear statutory statement to that effect, we should not attribute so counterintuitive an intent to the legislature in preference to a reasonable interpretation offered by the agency charged with administering the law.

Nor, contrary to Used Equipment's argument, does the portion of § 521(b)(2)(A) that allows the FHWA to impose a fine of up to $10,000 for a "serious pattern of violations" demonstrate that the FHWA's interpretation of the Act is impermissible. Instead, it indicates only that when a carrier has committed a series of regulatory violations that do not each rise to the level of a "substantial health or safety violation," the FHWA is still authorized to charge that carrier with a "serious pattern of violations." *See* S.Rep. No. 424, 98th Cong., 2d Sess., 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4769, 4785, 4786 ("serious pattern of violations" made out where violations "individually would not have a high probability of causing an immediate accident, but collectively demonstrate an unwillingness to exercise proper safety supervision or control, which will lead to accidents").

■ We turn now to the petitioner's challenge to the sufficiency of the evidence that there were indeed 13 separate dispatches. For no apparent reason, Used Equipment never raised this claim before the agency; therefore we do not have jurisdiction to entertain it. 49 U.S.C. § 521(b)(8) ("No objection that has not been urged before the [agency] shall be considered by the court, unless reasonable grounds existed for failure or neglect to do so").

*B. The Three Dispatches of MacDonald*

■ Three of Used Equipment's 13 violations of § 391.15 involved the dispatch of one MacDonald. It is undisputed that the petitioner violated § 391.15 if Used Equipment "knew" or "should have known" that Mac-Donald's license was suspended when it dispatched him. The ALJ concluded that although the dispatcher had actual knowledge of MacDonald's disqualification, his knowledge could not be imputed to the carrier because the dispatch of a disqualified driver was "in direct contravention of communicated company policy." Nevertheless, the ALJ reasoned that the carrier should have known that MacDonald was disqualified at the time he was dispatched because it should have done more to oversee company records and operations, which would have revealed that disqualified drivers were being dispatched notwithstanding "communicated company policy." The Associate Administrator affirmed the ALJ's decision, adding the observation that Used Equipment could "point[ ] to no facts that prevented [it] from more closely monitoring the work of both its drivers and dispatchers."

Used Equipment argues that there is not substantial evidence in the record to support the FHWA's finding that the carrier "should have known" of MacDonald's disqualification. Specifically, Used Equipment asserts that absent evidence of his disqualification having been "reduced to any writing that the company officers might have seen," or evidence of "any step that company officials should have taken that might lead to discovery of the alleged violation," the FHWA has effectively held the carrier strictly liable.

Our role in applying the "substantial evidence" standard "is to determine only whether the agency ... could fairly and reasonably find the facts as it did." *Throckmorton v. National Transp. Safety Bd.*, 963 F.2d 441, 444 (D.C.Cir.1992). We ask whether the agency had before it "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The answer in this case is that the record does contain substantial evidence that Used Equipment "should have known" of Mac-Donald's disqualification.

The record shows, and Used Equipment does not dispute, that its management "should have known" that some of its dispatchers had ignored its orders not to dispatch disqualified drivers. The record also shows that the violations involving Mac-Donald occurred four months after the violations involving one Bradley, another disqualified driver. If Used Equipment had known about the violations involving Bradley, as it admits it should have, then it would have had a duty to investigate whether its dispatchers were continuing to use disqualified drivers. *See Contract Courier Services, Inc. v. Research and Special Programs Administration*, 924 F.2d 112, 114 (7th Cir.1991) ("the 'should have known' concept requires inquiry and the law treats a person as possessing whatever knowledge inquiry would have produced"). And had it so investigated, *i.e.*, had the carrier regularly asked its dispatchers whether they were aware of any driver having been disqualified, the ALJ found, it would have learned of MacDonald's disqualification before he was dispatched. The evidence shows that the employee who dispatched MacDonald was fully aware of his disqualification. Used Equipment argues that there is no evidence that the dispatcher would have truthfully answered the company's inquiries, but we think the ALJ's assumption to that effect is reasonable in the absence of evidence to the contrary.

Thus, we see that the ALJ did not de facto apply a strict liability standard. There is substantial evidence that Used Equipment should have known that MacDonald was disqualified prior to the time when he was dispatched.

*C. Do the Dispatches of MacDonald Violate the Act?*

■ Used Equipment argues that the FHWA cannot reasonably interpret § 521(b)(2)(A) to mean that the dispatch of a disqualified driver in violation of § 391.15 automatically constitutes a "substantial health or safety violation ... which could reasonably lead to ... serious personal injury or death," that is, regardless of the reason for which the driver was disqualified. Because we agree that the FHWA's interpretation of § 521(b)(2)(A) is not a reasonable one, we vacate the penalties imposed for the three times that the carrier dispatched MacDonald while his license was suspended.

The FHWA ultimately upheld the ALJ's decision that the dispatches involving MacDonald were "substantial health or safety violation[s]," but it did so clearly upon the ground that the dispatch of any disqualified driver offends the quoted standard. The rationale for the ALJ's decision is not nearly so clear. First, the ALJ stated that "there was severe potential impact on public safety and health because ... MacDonald [was] disqualified for safety reasons." He supported that statement, however, with citations to three exhibits, two of which do not relate to MacDonald, and one of which (as the FHWA admits) does not exist. Later in the opinion, moreover, he contradicted his unsupported assertion: "because of [the FHWA]'s failure to set forth evidence establishing why MacDonald's Vermont license had been suspended, I am unable to conclude that MacDonald's disqualification constituted a serious driving infraction." Ultimately, the ALJ found that it was a "substantial health or safety violation" to dispatch MacDonald but, because the agency failed to provide evidence about the reason for which MacDonald's license was suspended, the ALJ imposed fines significantly lower than those he imposed for the violations involving the other two disqualified drivers. On appeal, the Associate Administrator recognized the contradictory character of the ALJ's decision, but gave it this gloss: "the [ALJ] concluded that the dispatch of MacDonald, who had been disqualified, was a substantial health or safety violation because of the serious threat to the traveling public posed by disqualified drivers."

■ The FHWA urges us to accept the Associate Administrator's rationale, *i.e.*, to allow that "*any* use of a disqualified driver is a 'most serious' substantial health or safety violation." The agency here refers to its own Civil Penalty Guidelines, in which "driving while disqualified" is listed as a "most serious" offense. *See Federal Highway Administration, Revised Civil Forfeiture Assessment Guidelines For Violations of the Motor Carrier Safety Regulations, Attachment B* at 2 (1989). The Guidelines were never promulgated pursuant to notice and comment rulemaking, however; like an interpretative rule, therefore, they have no legal effect apart from the agency's ability to persuade this court to the view they reflect. *See National Latino Media Coalition v. F.C.C.*, 816 F.2d 785 (D.C.Cir.1987).

The FHWA contends that the reason for a driver's disqualification is relevant only to the amount of the fine it imposes under § 521(b)(2)(A). Under the agency's interpretation of that section, therefore, the dispatch of a disqualified driver irrebuttably demonstrates a "substantial health or safety violation ... which could reasonably lead to ... serious personal injury or death," regardless of the evidence, if any, showing why the driver was disqualified.

This is more than the structure, much less the text, of § 521(b)(2)(A) can bear. It is difficult to see how the dispatch of a driver whose license is suspended for reasons completely unrelated to safety, *e.g.*, failure to pay a parking fine or to renew his license, "could reasonably lead to ... serious personal injury or death." Indeed, in the absence of any evidence showing why a driver's license was suspended, it seems completely unreasonable to presume irrebuttably that his dispatch presented any threat to motor vehicle safety, much less a threat that would lead to "serious personal injury or death." *Cf. Lutfy v. Lockhart*, 37 Ariz. 488, 492, 295 P. 975, 977 (1931) ("While possession of an operator's license, regularly issued, might be some evidence of [a driver's] competency, the lack of such license would be *no evidence whatever* that he was not a capable, skilled, and safe

driver"). Had the FHWA given the carrier an opportunity to rebut the presumption that the dispatch of MacDonald was a "substantial health or safety violation" by allowing it to show that his disqualification was neither health- nor safety-related, then we would be presented with a very different case; from the Final Order, however, it is clear that the agency considered the reason for which Mac-Donald's license was suspended to be relevant only to the size of the fine it would assess.

The structure of § 521(b)(2)(A) also makes it clear that the Congress intended the phrase "substantial health or safety violation" to denote a truly serious threat to highway safety. That section provides for two different degrees of safety violation—"a serious pattern of safety violations" and "a substantial health or safety violation ... which could reasonably lead to ... serious personal injury or death"—and authorizes the FHWA to impose a penalty in proportion to the severity of those violations. A "substantial health or safety violation" is the more grave, carrying a penalty of up to $10,000 per offense. To allow the agency to ground such a violation in a regulatory offense unrelated to safety would be to ignore the distinctions that the Congress drew when it created the different classes of safety violations and structured § 521(b)(2)(A) around them.

### III. CONCLUSION

For the reasons stated in Part II.C above, we grant Used Equipment's petition in part. In all other respects, the petition is denied.

*So ordered.*