UNITED STATES of America, Plaintiff,

v.

CHRYSLER CORPORATION, Defendant.

Civil Action No. 96–1236(EGS).

United States District Court,
District of Columbia.

Feb. 4, 1998.

**152**

Margaret S. Hewing, Civil Div., U.S. Dept. of Justice, Washington, DC.

Kenneth N. Weinstein, National Highway Safety Admin., Washington, DC. .

Erica Z. Jones, Lawrence S. Robbins, Gary A. Winters, Mayer, Brown & Platt, Washington, DC.

Lewis Goldfarb, Assistant General Counsel, Chrysler Corp., Auburn Hills, MI.

Rodney F. Page, Paul Jackson Rice, Arent Fox Kintner Plotkin & Kahn, Washington, DC.

Phillip D. Brady, Andrew D. Koblentz, American Automobile Manufacturers Association, Washington, DC.

## MEMORANDUM OPINION & ORDER

SULLIVAN, District Judge.

The United States of America commenced this action for declaratory and injunctive relief and civil penalties against Chrysler Corporation for alleged violations of the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), 49 U.S.C. § 30101 *et seq.*[1] The government claims that approximately 91,000 Chrysler Cirrus and Dodge Stratus passenger cars, manufactured before May 15, 1995, are not in compliance with the federal motor vehicle safety standard regulating seat belt assembly anchorages. Chrysler denies that the subject vehicles are not in compliance and challenges the government's interpretation of the safety standard. Pending

before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The American Automobile Manufacturers Association ("AAMA") has filed an *amicus curiae* brief in support of Chrysler's motion for summary judgment.[2] Upon consideration of the undisputed facts, relevant statutes, regulations and case law, and the record herein, plaintiff's motion for summary judgment is **GRANTED** in part, and **DENIED** in part. Defendant's motion for summary judgment is **GRANTED** in part, and **DENIED** in part.

The Court concludes that the government's interpretation of the safety standards under consideration is permissible and that the subject vehicles fail to comply with the standard as interpreted. The Court also concludes, however, that Chrysler was not provided with adequate notice of the government's interpretation of the relevant safety standards before Chrysler conducted its compliance test of the vehicle design on November 8, 1993 and issued its certification of the subject vehicles in March 1995. Thus, Chrysler was not in violation of the Safety Act when it conducted its compliance test and certified vehicular compliance with the relevant safety standards. Nonetheless, because the subject vehicles are currently not in compliance with the safety standards as interpreted by the agency charged with ensuring motor vehicle safety, the Court will **ORDER** Chrysler to notify owners, purchasers, and dealers of the noncompliance by no later than March 30, 1998, and provide a remedy without charge to the owners.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

The purpose of the Safety Act is "to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101. To this end, the Safety Act directs the Secretary of Transportation to "prescribe

---

1. This statute was originally codified at 15 U.S.C. § 1381 *et seq.* On July 5, 1994, the statute was repealed, and Congress contemporaneously enacted 49 U.S.C. § 30101 *et seq.* (1994), which has the exact same stated purpose as the 1966 Act. Pub.L. No. 103–272, § 7(b), 108 Stat. 1379 (1994). Congress sought to clarify ambiguities in

the 1966 Act "without substantive change." H.R.Rep. No. 103–180, at 1, (1993), *reprinted in* 1994 U.S.C.C.A.N. 818, 819–20.

2. AAMA is the trade association for Ford Motor Company, General Motors Corporation, and Chrysler Corporation.

motor vehicle safety standards for motor vehicles and motor vehicle equipment in interstate commerce." *Id.* The Secretary's general authority to promulgate safety standards under the Safety Act has been delegated to the Administrator of the National Highway Traffic Safety Administration ("NHTSA"). *See* 49 C.F.R. § 1.50(a). Each safety standard must protect the public against "unreasonable risk of accidents occurring because of the design, construction, or performance of motor vehicles and ... unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a).

Pursuant to 49 U.S.C. § 30111(a), NHTSA has promulgated numerous Federal Motor Vehicle Safety Standards. The safety standard regulating seat belt assembly anchorages is Federal Motor Vehicle Safety Standard ("FMVSS") No. 210. *See* 49 C.F.R. § 571.210. Seat belt assembly anchorages are the hardware that attach the seat belts to the actual vehicle structure. FMVSS No. 210 "establishes requirements for seat belt assembly anchorages to insure their proper location for effective occupant restraint and to reduce the likelihood of their failure." *Id.* at S1. The standard requires that the type of anchorages at issue here (Type 2) be capable of withstanding 3,000 pounds of force when tested in accordance with the specified test procedures. *See id.* at S4.2.2. The test procedures for establishing compliance with the requirements of FMVSS No. 210 are set out in paragraphs S5 [3] and S5.2 [4] of the standard. FMVSS No. 210 test procedures are

also set out in NHTSA's "Laboratory Test Procedure for FMVSS 210, Seat Belt Anchorages." Neither the standard nor the laboratory test procedures identify the placement of the pelvic body block during compliance testing.

FMVSS No. 210 was first promulgated in 1967 and has always required the type of seat belt anchorages at issue here to withstand 3,000 pounds of force. *See* 32 Fed. Reg. 2408, 2416 (1967). The strength requirement is "intended to ensure that the safety belt system will remain attached to the vehicle and not break free, even when exposed to severe crash forces." 55 Fed. Reg. 17,970, 17,981 (1990). Moreover, this standard has always required the use of body blocks during compliance testing, and has never specified the location of the pelvic body block. *See* 32 Fed.Reg. 2408, 2416 (1967).

## B. Statement of Facts

At issue are approximately 91,000 Model Year ("MY") 1995 Chrysler Cirrus and Dodge Stratus passenger cars manufactured by Chrysler Corporation between June 30, 1994, and May 15, 1995.[5] Chrysler conducted its compliance test of the vehicle design in question on November 8, 1993. The cars were certified as being in compliance with all applicable Federal motor vehicle safety standards, including FMVSS No. 210, in March 1995.

**3.** Paragraph S5 provides as follows:

For the testing specified in these procedures, the anchorage shall be connected to material whose breaking strength is equal to or greater than the breaking strength of the webbing for the seat belt assembly installed as original equipment at that seating position. The geometry of the attachment duplicates the geometry, at the initiation of the test, of the attachment of the originally installed seat belt assembly.
49 C.F.R. § 571.210, S5.

**4.** Paragraph S5.2 provides as follows:

With the seat in its rearmost position, apply forces of 3,000 pounds in the direction in which the seat faces simultaneously *to a pelvic body block,* as described in Figure 2A, and an upper torso body block, as described in Figure 3, in a plane parallel to the longitudinal centerline of the vehicle, with an initial force application angle of not less than 5 degrees nor more

than 15 degrees above the horizontal. Apply the forces at the onset rate of not more than 30,000 pounds per second. Attain the 3,000 pound forces in not more than 30 seconds and maintain it for 10 seconds. At the manufacturer's option, the pelvic body block described in Figure 2B may be substituted for the pelvic body block described in Figure 2A to apply the specified force to the center set(s) of anchorages for any group of three or more sets of anchorages that are simultaneously loaded in accordance with S4.2.4 of standard.
*Id.* at S5.2 (emphasis added).

**5.** Chrysler Cirrus and Stratus vehicles manufactured after May 15, 1995, are not at issue in this case because, as Chrysler maintains, in the course of a production change solely to allow the Cirrus to share a design with another vehicle, it added a "tapping plate" to the anchorage which increased its strength and apparently ameliorated the problem addressed in this opinion.

In July 1995, NHTSA's Office of Vehicle Safety Compliance contracted with General Testing Laboratories ("GTL") of Leedstown, Virginia to test the seat belts of several vehicles, including the MY 1995 Chrysler Cirrus passenger car. On July 10, 1995, GTL performed a FMVSS No. 210 compliance test on a MY 1995 Chrysler Cirrus passenger car. In testing the seat belt anchorages, rather than replacing the original belt webbing with wire rope to prevent buckle and webbing breakage, as explicitly allowed by FMVSS No. 210, GTL instead placed the pelvic body block a few inches forward from the rear seat back to prevent the plastic seat belt buckles from breaking during the test. The anchorage for the driver's-side rear seat lap belt pulled completely out of the floor after approximately 24 seconds, when the force on the lap belt was 2,829 pounds of force. FMVSS No. 210 requires that the anchorage maintain a force of 3,000 pounds for 10 seconds. *See* 49 C.F.R. § 571.210, S5.2. NHTSA notified Chrysler of the test failure.[6]

In August 1995, NHTSA requested that Chrysler acknowledge noncompliance and recall the MY 1995 Cirrus cars. In a September 28, 1995 letter to NHTSA, Chrysler contended that the test was invalid due to the placement of the pelvic body block. Chrysler stated that GTL's decision not to replace the belt webbing with wire rope, as explicitly allowed by the standard, but instead, to move the pelvic body block forward, was the cause of the July 10, 1995 test failure. Chrysler thus declined to find the cars in noncompliance or recall them.

In a December 21, 1995 letter to Chrysler, NHTSA acknowledged that neither the FMVSS No. 210 nor the laboratory test procedures specify a position for the pelvic body block. (*See* Pl. Mem. Ex. 9.) NHTSA indicated however that, as was expressed in the December 5, 1991 Federal Register notice, where a standard does not specify the specific test conditions, manufacturers must therefore pass the strength test "with the safety belt and other vehicle features at any adjustment." *Id.*

On January 22, 1996, NHTSA notified Chrysler of its initial decision that MY 1995 Chrysler Cirrus and Dodge Stratus passenger cars manufactured before May 15, 1995, do not comply with FMVSS No. 210. On February 23, 1996, NHTSA held a public meeting, pursuant to 49 U.S.C. § 30118(b), to allow Chrysler and other interested persons the opportunity to present information, views and arguments on NHTSA's initial decision of noncompliance. On June 4, 1996, NHTSA issued a final decision, pursuant to 49 U.S.C. § 30118(b), that the cars in question do not comply with FMVSS No. 210. Pursuant to 49 U.S.C. § 30118(b)(2), the NHTSA Administrator ordered Chrysler to notify owners, purchasers, and dealers of the noncompliance no later than July 8, 1996, and to provide a remedy without charge. Chrysler previously had informed NHTSA that it would not recall the vehicles unless ordered to do so by a court. The U.S. Government filed this present action pursuant to 49 U.S.C. § 30163(a), to force Chrysler to comply with the order of the NHTSA Administrator.

## II.  STANDARD OF REVIEW

### A.  Motion for Summary Judgment

Summary judgment should be granted pursuant to Federal Rule of Civil Procedure 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975). The cross-motions for summary judgment pending before the Court present no genuinely disputed material facts that would preclude summary judgment.

### B.  Review of Agency Action

This action was brought pursuant to the Safety Act by the federal government

---

**6.** The MY 1995 Dodge Stratus was not tested by NHTSA. However, it is identical to the Chrysler Cirrus in all relevant respects, and similar test results would be expected.

seeking declaratory and injunctive relief and for civil penalties against Chrysler Corporation for alleged noncompliance with Federal Motor Vehicle Safety Standard No. 210. District courts have jurisdiction over enforcement actions brought by the United States against motor vehicle manufacturers. *See* 49 U.S.C. § 30163(a). As a defense to this enforcement action, Chrysler is challenging the validity of FMVSS No. 210 as interpreted by NHTSA.[7] In reviewing challenges to NHTSA safety standards, the Court must determine whether the agency's rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Simms v. National Highway Traffic Safety Admin.,* 45 F.3d 999, 1003 (6th Cir. 1995); *Paccar, Inc. v. National Highway Traffic Safety Admin.,* 573 F.2d 632, 636 (9th Cir.1978); *Chrysler Corp. v. Department of Transp.,* 472 F.2d 659 (6th Cir.1972); *Automotive Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330 (D.C.Cir.1968).

■ In reviewing an agency's interpretation of its own regulation, the Court must accord the agency's interpretation a high level of deference. *See S.G. Loewendick & Sons, Inc. v. Reich,* 70 F.3d 1291, 1294 (D.C.Cir.1995) ("Well-known principles govern our review of agency interpretations of agency regulations. We owe 'substantial' deference' to the agency's interpretation, which has 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994))); *see also General*

*Elec. Co. v. U.S. EPA,* 53 F.3d 1324, 1327 (D.C.Cir.1995); *General Carbon Co. v. OSHRC,* 860 F.2d 479, 483 (D.C.Cir.1988).

## III. DISCUSSION

At issue is NHTSA's interpretation of FMVSS No. 210, specifically paragraph S5.2, which does not specify the placement of the pelvic body block during the compliance test. Chrysler argues that NHTSA has articulated an impermissible interpretation of FMVSS No. 210 that fails to meet the requirements of the Administrative Procedure Act ("APA") and the Safety Act. Chrysler also argues that NHTSA failed to provide adequate notice of its interpretation of the standard.

### A. NHTSA's Interpretation

The first task for the Court is to determine NHTSA's exact interpretation of the standard. NHTSA, in the course of the administrative proceedings and this enforcement action, has articulated its interpretation in different ways.[8] The Court does not find that these are in fact different interpretations, but merely differently worded restatements. Having considered all of NHTSA's expressions of its interpretation, the Court concludes that NHTSA's interpretation of FMVSS No. 210 is that vehicles must comply with FMVSS No. 210 when tested with the pelvic body block in any position that would extend the lap belt to accommodate a 50th percentile 6–year–old to a 95th percentile adult male. It is this interpretation the Court reviews.[9]

---

7. Challenges to safety standards are generally reviewed by the U.S. Courts of Appeals in pre-enforcement actions. *See* 49 U.S.C. § 30161. However, the government's initiation of this action pursuant to 49 U.S.C. § 30163(a), grants this Court jurisdiction over the issue of the standard's validity raised as a defense by Chrysler. *See Chrysler Corp. v. Department of Transp.,* 472 F.2d 659, 670 & n. 13 (6th Cir.1972).

8. NHTSA has stated that FMVSS No. 210 must be satisfied with the pelvic body block placed "at any reasonable location," (Pl. Mem. at 1), "at any position that would reflect actual occupant usage," (Pl. Mem. at 3), "in any position consistent with the language and purposes of FMVSS

No. 210," (Pl.Rep. at 5), "in any position that would extend the lap belt to accommodate ... a [50th percentile] 6–year–old to a 95th percentile adult male," (Pl.Rep. at 7).

9. In challenging NHTSA's finding that the subject vehicles do not comply with FMVSS No. 210, Chrysler also claims that NHTSA has not demonstrated that the subject vehicles failed to comply with the standard with the lap belts reflecting real-world geometry. Because the Court does not find that NHTSA's interpretation requires that the test conditions replicate the exact placement of the seat belt when worn by an actual person, this argument is rejected.

## B. APA Notice and Comment Requirement

Chrysler claims that NHTSA's interpretation of FMVSS No. 210 is invalid because NHTSA failed to comply with the requirements of the APA. Chrysler maintains that NHTSA's stated interpretation expands the requirements of the standard, which is silent with regard to the placement of the pelvic body block and therefore, NHTSA's interpretation is a legislative rule requiring notice and comment.

■ The APA requires an agency issuing a "legislative" or "substantive" rule to provide the public with notice and an opportunity for comment before the rule goes into effect. *See* 5 U.S.C. § 553(b), (c). Substantive rules are rules which "grant rights, impose obligations, or produce other significant effects on private interests," or which "effect a change in existing law or policy." *American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987) (citations omitted). Substantive rules also "have the force and effect of law." *American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1109 (D.C.Cir.1993) (citing Attorney General's Manual on the Administrative Procedure Act (1947)).

■ While substantive rules must be issued pursuant to the notice and comment requirements of the APA, interpretive rules are exempt from these requirements. *See* 5 U.S.C. § 553(b)(3)(A). Interpretive rules "are those which merely clarify or explain existing law or regulations," are "essentially hortatory and instructional," and "do not have the full force and effect of a substantive rule but [are] in the form of an explanation of particular terms." *American Hosp. Ass'n,* 834 F.2d at 1045 (citations omitted). "An interpretive rule ... typically reflects an agency's construction of a statute that has been entrusted to the agency to administer." *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C.Cir.1997); *see American Mining Congress,* 995 F.2d at 1109.

■ In *American Mining Congress,* this circuit set forth four questions the Court should answer in resolving the issue of whether an agency rule is substantive or interpretive. An affirmative response to any of the following four questions would indicate that the rule at issue is substantive:

(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Id.* at 1112.

■ When applied to this case, the first inquiry, "whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties," *id.,* is answered in the negative. This inquiry focuses on whether an adequate legislative basis existed for an enforcement action even before the rule at issue was articulated. Such is the case here. FMVSS No. 210 created the requirement that auto manufacturers test the seat belt assembly anchorages with 3,000 pounds of force being applied to body blocks. As required for rules creating substantive duties, FMVSS No. 210 was promulgated in 1967 pursuant to the requirements of the APA. Because FMVSS No. 210 created the duty, Chrysler's duty existed before NHTSA explicitly interpreted the standard. NHTSA's interpretation merely "spell[ed] out the scope of [that] pre-existing duty." *Id.* at 1110. The fact that NHTSA's interpretation may have "widen[ed] that duty" does not necessarily make the interpretation legislative. *Id.* (citing *Fertilizer Institute v. United States EPA,* 935 F.2d 1303, 1308 (D.C.Cir. 1991)).

The second inquiry, "whether the agency has published the rule in the Code of Federal Regulations," *id.,* and the third inquiry, "whether the agency has explicitly invoked its general legislative authority," *id.,* are likewise answered in the negative in this case.

The fourth and final inquiry, "whether the rule effectively amends a prior legislative rule," *id.,* is also answered in the negative. While the standard specifies that a pelvic

body block should be used in testing, the standard is silent with respect to the *placement* of the pelvic body block.[10] However, it is well understood that the pelvic body block must be placed somewhere on the seat. This case presents the first instance in which NHTSA has provided an explicit interpretation of FMVSS No. 210 with respect to the placement of the pelvic body block. Thus, NHTSA's interpretation is not inconsistent with the plain meaning of the standard or with a prior interpretation. Having applied the test articulated by this circuit, the Court concludes that NHTSA's interpretation is indeed an interpretive rule, and not a legislative or substantive rule requiring notice and comment.

Chrysler is correct that, if viewed as an interpretive rule, NHTSA's interpretation does not have the force and effect of law. However, not having the effect and force of law in this context simply means that the rule has "no legal effect apart from the agency's ability to persuade this court to the view [it] reflect[s]." *Used Equip. Sales, Inc. v. Department of Transp.*, 54 F.3d 862, 867 (D.C.Cir.1995) (citing *National Latino Media Coalition v. FCC*, 816 F.2d 785 (D.C.Cir. 1987)). If the Court accepts NHTSA's interpretation of the standard, the agency's interpretation will in effect become binding. *See Doe v. Reivitz*, 830 F.2d 1441, 1447 (7th Cir.1987) ("Agency interpretations, unlike legislative rules, are not controlling on the courts.... The courts may find [agency interpretations] persuasive and may treat them as if they were binding...."), amended by

842 F.2d 194 (7th Cir.1988); *see also Shalala v. St. Paul–Ramsey Med. Ctr.*, 50 F.3d 522, 527 n. 4 (8th Cir.1995).

### C. Safety Act

Chrysler also argues that NHTSA's interpretation of FMVSS No. 210 violates the Safety Act. Under the Safety Act, NHTSA's interpretation must be objective, practicable, and meet the need for motor vehicle safety. 49 U.S.C. § 30111(a). In claiming that the standard as interpreted by NHTSA is not objective, Chrysler maintains that the standard is not accompanied by objectively defined performance requirements and test procedures as required by *Chrysler Corp. v. Department of Transp.*, 472 F.2d 659 (6th Cir.1972).[11]

In *Chrysler Corp.*, several auto manufacturers sought judicial review of the portion of FMVSS No. 208 which required the installation of passive restraints on all new cars.[12] The court rejected the auto manufacturers' argument that NHTSA had no authority to promulgate a safety standard that would require the development of new technology by the auto manufacturers. *See id.* at 671–75. The court, however, agreed with the auto manufacturers that because the agency failed to specify completely the standards regulating the construction of anthropomorphic crash test dummies which were required to be used in FMVSS No. 208 testing, the test devices would not produce consistent, reliable or repeatable test results. *See id.* at 675–78.

---

10. Unlike the rule challenged in *Syncor*, the rule here "construe[s] ... language in a relevant statute or regulation," *Syncor*, 127 F.3d at 95. Here, the agency interpreted the safety standard at issue to explain where the pelvic body block mentioned in the regulation should be placed during testing.

11. Chrysler also argues that the alleged "any adjustment" interpretation is not objective because such a requirement would require an endless series of tests. Because the Court has concluded that NHTSA's interpretation is not the "any adjustment" interpretation posited by defendant, the Court need not address this argument.

12. Standard 208 "specifies performance requirements for the protection of vehicle occupants in crashes." 49 C.F.R. § 517.208, S1. The purpose of FMVSS No. 208 "is to reduce

the number of deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crashworthiness requirements in terms of forces and accelerations measured on anthropomorphic dummies in test crashes, and by specifying equipment requirements for active and passive restraint systems." *Id.* at S2.

A passive restraint is defined as:
a protective occupant restraint device which does not depend for its effectiveness upon any action taken by the occupants beyond that necessary to operate the vehicle. An active restraint is a device which is not effective unless some action is taken by the occupants, the most familiar example of which is the fastening of a seat belt.... An airbag is a passive inflatable occupant restraint system.
*Chrysler Corp.*, 472 F.2d at 664.

Based on this finding, the court held that the standard was not objective. *See id.*

In its decision, the Sixth Circuit defined the objectivity component as requiring (1) "that tests to determine compliance must be capable of producing identical results when test conditions are exactly duplicated," (2) "that [the results] be decisively demonstrable by performing a rational test procedure," and (3) "that compliance is based upon the readings obtained from measuring instruments as opposed to the subjective opinions of human beings." *Id.* at 676. Chrysler maintains that FMVSS No. 210, as interpreted by NHTSA, fails to satisfy this objectivity test. The Court disagrees.

■ In addressing Chrysler's contention, the Court first notes that the test procedure at issue in *Chrysler Corp.* is very different from the test procedure at issue here. In *Chrysler Corp.*, the test procedure involved a dynamic crash test using anthropomorphic test dummies. *Id.* at 666–67. The test results in that case were to be determined, in part, by readings gathered from the test dummies themselves. *See id.* at 667 n. 6. In contrast, the procedure at issue here is a static test requiring the use of a simple pelvic

body block.[13] Test results are determined by visually observing whether the seat belt anchorage held.

Having a basic understanding of the test procedure at issue in *Chrysler Corp.* is key to understanding the Sixth Circuit's stated objectivity test. In *Chrysler Corp.*, the court found that the objectivity requirement was not satisfied because NHTSA had not specified the requirements for the dummies sufficiently to guarantee that tests under identical conditions would yield identical results. *See id.* at 675–78.

The test procedure in this case does not suffer from the same problem. There is no indication, indeed no specific claim made by Chrysler, that there is a risk that under identical conditions test results will not be the same. Thus, the first prong of the *Chrysler Corp.* test is satisfied.[14] The second prong of the test is also satisfied because the basic procedure is rational and the test results are decisively demonstrable. Likewise, the third prong is satisfied because the use of subjective opinions of human beings is not required to determine if the anchorage held.[15] Thus, the *Chrysler Corp.* test of ob-

13. The April 30, 1990 Federal Register notice provides the following statements regarding static and dynamic tests:

> Standard No. 210 uses a laboratory test instead of a crash test to measure the strength of safety belt anchorages. In a laboratory, or "static" test, forces are slowly applied to the anchorages for a period of up to 30 seconds. In a crash, or "dynamic" test, forces are quickly applied and last for less than a second. 55 Fed.Reg. 17,970, 17,971 (1990).

14. It is Chrysler's misinterpretation of *Chrysler Corp.* which leads it to state that *Chrysler Corp.* requires the government "to duplicate the *manufacturer's* test." (Def. Rep. at 16 (emphasis in original)). The Sixth Circuit was not concerned with duplication of the test, but rather duplication of the test results when the test conditions were identical.

15. Chrysler argues that because the pelvic body block is placed in a specific position based upon a subjective determination, the "subjectivity test" articulated in *Chrysler Corp.* is not satisfied. (Def. Mem. at 33.) The Court is not persuaded. This requirement focuses on the reading of the test results. The test results in *Chrysler Corp.* were to be determined from readings taken from the test dummies whose specifications were not

complete. As a solution to that problem, the government proposed the following:

> If the NHTSA concludes after investigation that a manufacturer's tests are properly conducted, with dummies meeting the specifications, and show compliance with the standard, and that differences in results from tests conducted by the agency are due to differences in the test dummies used by each, the Agency tests will not be considered to be the basis for a finding of noncompliance.

*Chrysler Corp.*, 472 F.2d at 678 (citing 36 Fed. Reg.19255). In rejecting the government's solution to the problem created by the incomplete dummy specifications, the Sixth Circuit stated:

> This statement is illusory. This test allows as many as three subjective judgments to be made by the Agency, including the ultimate determination of whether the differences in results from tests conducted by the Agency are due to differences in the test dummies used by each. As noted above, objectivity requires that each essential element of compliance be made by specified measuring instruments; there is no room for an "agency investigation" in this procedure. The inherent uncertainty of this procedure is no substitute for the specification of an adequate test device, especially in light of the Agency's power to specify such a device.

*Id.*

jectivity is satisfied here. *See Paccar, Inc.,* 573 F.2d at 644.

Chrysler's argument concerning the objectivity of FMVSS No. 210, as interpreted by NHTSA, is in actuality a challenge to the specific compliance test performed by GTL and the failure of the laboratory to record the exact placement of the body block. Chrysler maintains that the test cannot be repeated under identical conditions because the exact placement of the body block cannot be ascertained. However, GTL's failure to record the position of the pelvic body block during the compliance test does not result in the standard itself failing to satisfy the objectivity requirements set forth in *Chrysler Corp.* Although the Court finds the standard as interpreted to be objective, the issue raised by Chrysler does merit discussion by the Court.

The government insists that the placement of the pelvic body block during the GTL test is known. The Court disagrees. Not only was the position of the pelvic body block not recorded during the compliance test, statements in the record before the Court raise significant doubts as to the accuracy of the government's contention.[16] Thus, the Court concludes that the exact placement of the pelvic body block is not known.

This finding, however, is not fatal to the government's case for two reasons. First, while the exact placement of the pelvic body block may be unknown, the record does indicate that the pelvic body block was placed between two to five inches from the seat back. Therefore, during the GTL compliance test, the pelvic body block was placed in a position consistent with NHTSA's interpretation, which requires that the test be satisfied with the pelvic body block placed in any position that would reflect the position of a 50th percentile 6-year old to a 95th percentile adult male.[17] Because the GTL test was conducted with the pelvic body block within the permissible range, the test may be used to determine compliance.

Second, NHTSA's inability to ascertain the exact location of the pelvic body block is not fatal to the government's case for another and even more important reason—Chrysler is not challenging the test *results.* Chrysler does not dispute that when tested with the pelvic body block moved forward a few inches, the subject vehicles fail to satisfy FMVSS No. 210. Indeed, Chrysler has gone so far as to explain the reason for the failure, concluding that moving the body block forward produced 15 percent more elastic stress on the seat belt webbing, which results in greater forces being applied to the anchorages. See Pl. Mem. Ex. 6, Letter from Chrysler to NHTSA of 9/28/95, at 1. Since the record reflects that the pelvic body block was in a position within the range required for compliance, and because Chrysler is not challenging the results of the GTL test, the Court concludes that the exact placement of the pelvic body block need not be ascertained in this case before noncompliance with FMVSS No. 210 can be found.

As previously stated, the Court holds that FMVSS No. 210, as interpreted by NHTSA, is objective. The Court also holds that the standard is practicable, rational and meets the needs for motor vehicle safety. Accordingly, because the Court concludes that FMVSS No. 210, as interpreted by NHTSA, satisfies the APA and the Safety Act, the Court holds that NHTSA's interpretation is likewise permissible. *See S.G. Loewendick & Sons, Inc.,* 70 F.3d at 1294 ("We owe 'substantial deference' to the agency's interpretation, which has 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" (citing *Thomas Jefferson Univ.,* 512 U.S. at 512)). The Court also concludes, based on the record before it, that the subject vehicles fail to comply with FMVSS No. 210 as interpreted by NHTSA.

---

**16.** The government has presented conflicting statements regarding the placement of the body block in the Chrysler test. It has claimed that during the anchorage test of the Chrysler car, the pelvic body block was moved forward "a few inches," (Pl. Mot. at 3, 11), "two inches," (Pl.Ex. 7 at 453), "less than four inches," (Pl. Exs. 9 at 485, 21 at 865), "four inches," (Pl.Ex. 16 at.

449), and "four to five inches," (Giuseppe 2d Decl. ¶ 8; Def. Ex. 12 at 51–52).

**17.** Based on the record before the Court, this interpretation would appear to require the pelvic body block to be positioned between 2 to 6.5 inches from the seat back. (*See* Pl.Ex. 7 at 453–54).

## D. Adequate Notice

The Court's conclusion that NHTSA's interpretation is permissible and that the subject vehicles do not comply with the standard does not end the inquiry in this case. It is well-settled in this circuit that agencies must provide fair notice of the conduct required or prohibited by a regulation before a violation of the regulation can occur. *See General Elec. Co. v. U.S. EPA,* 53 F.3d 1324 (D.C.Cir.1995); *Satellite Broadcasting Co., Inc. v. FCC,* 824 F.2d 1 (D.C.Cir.1987); *Gates & Fox Co., Inc. v. OSHRC,* 790 F.2d 154 (D.C.Cir.1986). In determining whether adequate notice was provided, the Court must determine

if, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation.

*General Elec. Co.,* 53 F.3d at 1329 (citing *Diamond Roofing Co. v. OSHRC,* 528·F.2d 645, 649 (5th Cir.1976)). Chrysler argues that NHTSA did not provide it with sufficient notice of NHTSA's now articulated interpretation of FMVSS No. 210 before Chrysler tested the subject vehicles on November 8, 1993.

In determining the adequacy of the notice, the Court first reviews the language of the standard itself. *See General Elec. Co.,* 53 F.3d at 1329. The standard in this case is completely silent with respect to where the pelvic body block should be placed during compliance testing. Further, while paragraph S5 of FMVSS No. 210 does provide that "[w]here a range of values is specified, the vehicle shall be able to meet the requirements at all points within the range," paragraph S5.2 makes no mention of a range of positions for placement of the pelvic body block. The language of the standard in no way provides the auto manufacturers with information from which they could conclude that in order to meet FMVSS No. 210 they must, *inter alia,* satisfy S5.2 with the pelvic body block in any position that would extend the lap belt to accommodate a 50th percentile 6–year–old to a 95th percentile adult male.

Having found that the standard itself would not have provided Chrysler with adequate notice of NHTSA's interpretation, the Court next examines the 1991 Federal Register notice, a public statement related to the standard which was issued by the agency. The government maintains that the 1991 Federal Register Notice provided Chrysler with sufficient notice of NHTSA's interpretation of FMVSS No. 210. In the preamble of the 1991 Federal Register notice, the following was stated:

As a general matter, when a standard does not specify a particular test condition, there is a presumption that the requirements of the standard must be met at all such test conditions. This presumption that the standard must be met at all positions of unspecified test conditions may be rebutted if the language of the standard as a whole or its purposes indicate an intention to limit unspecified test conditions to a particular condition or conditions. In the case of the strength requirements in Standard No. 210, nothing in the language of the standard suggests that the strength requirements were only to be measured with the safety belt or other vehicle features at certain adjustment positions. Indeed, the purpose of the standard is to reduce the likelihood that an anchorage will fail in a crash. To serve this purpose, the anchorage must be capable of meeting the strength requirements with the safety belt and other vehicle features at any adjustment, since those features could be at any adjustment position during a crash.

56 Fed.Reg. 63,676, 63,677 (1991). The government concedes that the placement of the pelvic body block was not the subject of, and not discussed in, the 1991 Federal Register Notice. The government claims, however, that the publication of its *general policy* concerning silence in standards, in the Federal Register preamble to an amendment to FMVSS No. 210—the specific standard at issue here—was sufficient to give Chrysler notice of NHTSA's present articulated interpretation of the standard. Moreover, NHTSA contends that Chrysler was aware of the general policy and the application of that policy by NHTSA in many different contexts.

The Court finds that had Chrysler applied this general policy to S5.2, it could have, acting in good faith, been able to determine with *ascertainable certainty* that compliance with FMVSS No. 210 required that the S5.2 be satisfied with the pelvic body block in any position that would extend the lap belt to accommodate a 50th percentile 6–year–old to a 95th percentile adult male.[18] Thus, the question is whether Chrysler *should have known* to apply NHTSA's general policy to S5.2.

The government maintains that Chrysler had no reason not to apply the general policy to S5.2. In support of this contention, the government claims that Chrysler was not directed to test with the pelvic body block against the seat back. The government also claims that it did not lead Chrysler to believe that compliance testing was done by NHTSA contractors with the pelvic body block against the seat back, noting test procedure diagrams and pretest photographs [19] which demonstrate that the FMVSS No. 210 compliance testing is done, at least in some instances, with the pelvic body block placed a few inches forward from the rear seat back. In essence, the government is claiming that the government never suggested to Chrysler that it test with the pelvic body block against the seat back, or in any single position, and, therefore, in no way suggested to Chrysler that the general policy not be applied to S5.2.

The Court agrees, based on the record before it, that NHTSA at no time *explicitly* directed auto manufacturers to place the pelvic body block against the seat back for FMVSS No. 210 compliance testing or indi-

cated that satisfaction of the test with the pelvic body block in any single position was sufficient for compliance of the standard. However, whether Chrysler was *indirectly* led to believe that testing against the seat back was satisfactory for testing for compliance with FMVSS No. 210 is a more difficult issue.

In challenging NHTSA's interpretation, Chrysler argues that the test procedures require the contractors to replace the seat belt buckle if there is a risk of breakage. The test procedures state that "if it appears that the seat belt buckle or webbing may incur loading that may cause it to fail, replace the seat belt webbing and or buckles in the area of the body blocks with wire ropes." TP–210–08, at 19.

The government maintains that the test procedures do not *require* the testing contractors to replace the seat belt buckle during FMVSS No. 210 compliance testing, noting that the test procedures not only indicate that modifications made to the test vehicles be kept to a minimum, but also indicate that the Contracting Officer's Technical Representative makes the final decision regarding whether replacements will be made. The government further maintains that the test procedures are not intended to tell auto manufacturers how to test in order to ensure compliance. While the Court agrees with the government that the test procedures do not *require* the testing contractors to replace the seat belt buckle, the Court rejects the government's argument that the procedures should not be considered by the auto manu-

---

18. Chrysler makes much of the fact that GTL moved the pelvic body block forward during FMVSS No. 210 compliance testing for the sole purpose of avoiding seat belt buckle breakage during the test. This is apparently the case because NHTSA was unaware that the position of the pelvic body block would have an effect on the test. The Chief of the Vehicle Division of the Office of Vehicle Safety Compliance, stated that "FMVSS No. 210 has never specified a position for the pelvic body block ... [because] until this enforcement proceeding, *no one had ever suggested that body block position was relevant to anchorage performance in FMVSS No. 210 testing.*" Thompson Decl. at 28 (emphasis added). At first glance, this fact appears significant. However, it is the fact that not all variables can be known to the government that the need for general policies, like the one discussed here, exists.

19. The government acknowledges that the pretest photographs depict the pretest setup after a preload of approximately 300 pounds of force has been applied, pulling the pelvic body block forward. The government maintains, however, that some pretest photographs demonstrate that the pelvic body block did not start against the seat back because the 300 pounds of force alone would not have pulled the pelvic body block as far forward as shown in the photographs. The government claims that Chrysler's engineers should have concluded from at least some pretest photographs that the pelvic body block was not placed against the seat back at the beginning of the test.

facturers when they are seeking to determine how to test themselves for compliance. The test procedures are public statements issued by the agency and are the only public statements brought to the Court's attention, other than the standard itself, which make some reference to the pelvic body block. Even if auto manufacturers cannot rely solely on the test procedures to ensure compliance, the test procedures are certainly relevant in determining whether Chrysler had adequate notice of NHTSA's interpretation of S5.2, especially where, as here, NHTSA offered little guidance on this issue.

■ Moreover, the test procedures are consistent with the standard itself. In part, paragraph S5 provides as follows:

> For the testing specified in these procedures, the anchorage shall be connected to material whose breaking strength is equal to or greater than the breaking strength of the webbing for the seat belt assembly installed as original equipment at that seating position.

49 C.F.R. § 571.210, S5. This amendment was made to the standard to address the seat belt buckle breakage during compliance testing and was made "so that all parties would know precisely how compliance testing will be conducted by the agency." 55 Fed.Reg. 17,970 (1990). Because the risk of seat belt buckle breakage occurs if a test vehicle's

original seat belts are used and the pelvic body block is placed directly against the seat back, paragraph S5 and the test procedures could reasonably appear to contemplate compliance testing with the pelvic body block against the seat back. At the very least, they suggest that testing with the pelvic body block against the seat back is within the permissible range of positions. This reasonable inference is inconsistent with the government's articulated interpretation of FMVSS No. 210, which is that vehicles must comply with FMVSS No. 210 when tested with the pelvic body block positioned between 2 to 6.5 inches from the seat back.[20] This fact makes it difficult for the Court to conclude that Chrysler, acting in good faith, would have been able to identify with *ascertainable certainty* that vehicles must comply with FMVSS No. 210 when tested with the pelvic body block in any position that would extend the lap belt to accommodate a 50th percentile 6–year–old to a 95th percentile adult male, i.e., with the pelvic body block positioned between 2 to 6.5 inches from the seat back. Because the Court cannot reach such a conclusion, the Court must conclude that Chrysler was not provided with sufficient notice of NHTSA's recently articulated interpretation of FMVSS No. 210.[21] Thus, Chrysler cannot be found to have been in violation of sections 30112(a) or 30115 the

**20.** Moreover, the fact that NHTSA does or has on occasion tested for compliance with the pelvic body block against the seat back, while not conclusive, gives rise to a reasonable inference that NHTSA considered this position to be within the permissible range. It would defy logic for NHTSA to test with the pelvic body block in a position which NHTSA knows not to be within a permissible range. This is so because if there was a test failure, the auto manufacturer could argue, as NHTSA pointed out during the motions hearing, that NHTSA had not shown that the manufacturer violated the standard because the pelvic body block was not within the proper range. NHTSA would then have to retest the vehicle with the pelvic body block within the permissible range. Such duplicate testing would be contrary to NHTSA's goal of having efficient and accurate compliance testing.

The Court notes that this point does not affect the Court's conclusion that NHTSA's articulated interpretation is an "interpretive," as opposed to a "substantive," rule. While it may be reasonable to *infer* from the fact that NHTSA has tested with the pelvic body block against the seat back,

that NHTSA considered this position to be within the permissible range, this *inference* does not make NHTSA's interpretation of S5.2 inconsistent with the plain meaning of the standard, nor does a reasonable *inference* constitute a prior interpretation.

**21.** Chrysler acknowledges that it did not inquire of NHTSA for the agency's interpretation of FMVSS No. 210 with respect to the placement of the body block but, rather, decided to test for compliance of the standard with the pelvic body block against the seat back after assessment by the Chrysler engineers. Chrysler's failure to inquire about the placement of the pelvic body block does not alter the Court's conclusion. While it is true that the auto manufacturers bear the burden of ensuring that its vehicles comply with the standards, NHTSA certainly bears the burden of adequately informing the regulated of what is necessary for compliance. In determining adequate notice, the focus is on what the agency did or did not do, not necessarily on what the regulated could have done to seek further guidance. *See General Elec. Co. v. U.S. EPA,* 53 F.3d 1324 (D.C.Cir.1995).

Safety Act, which prohibit the manufacturing and certifying of vehicles that fail to comply with safety standards if the manufacturer should have known, in exercising reasonable care, that the vehicles were in noncompliance when it manufactured and certified the subject vehicles. *See General Elec. Co.*, 53 F.3d at 1329.

### E. Recall

■ The Court has concluded that NHTSA's interpretation is permissible and that the subject vehicles do not comply with the standard as interpreted by NHTSA. The Court has also concluded, however, that Chrysler was not provided with adequate notice of NHTSA's interpretation before it conducted its compliance test and issued its certification, and therefore, at the time of testing and certification Chrysler was not in violation of the Safety Act. One final issue requires the Court's attention—whether the subject vehicles can be recalled. The Court first notes that in prior cases addressing the issue of adequate notice of an agency's interpretation of a regulation, the issue of recall never arose. *See, e.g., General Elec. Co. v. U.S. EPA*, 53 F.3d 1324 (D.C.Cir.1995); *Satellite Broadcasting Co., Inc. v. FCC*, 824 F.2d 1 (D.C.Cir.1987); *Gates & Fox Co., Inc. v. OSHRC*, 790 F.2d 154 (D.C.Cir.1986); *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir.1976). In view of this Court's conclusion that the subject vehicles are not

presently in compliance with the safety standard as interpreted by the agency charged with ensuring motor vehicle safety, this Court is compelled to address this issue.

■ The Safety Act requires a manufacturer who becomes aware that its vehicles do not comply with a safety standard to notify NHTSA and the owners, purchasers, and dealers of the vehicles, and remedy the noncompliance without charge, i.e., to recall the vehicles.[22] 49 U.S.C. § 30118(b)(2), (c). Section 30118 does not exempt from the recall requirement manufacturers who reasonably did not realize earlier that their vehicles were not in compliance, unlike sections 30112[23] and 30115[24] of the Safety Act. The manufacturer's duty to conduct a recall is a different and separate issue from whether a manufacturer has violated the Safety Act by producing and certifying vehicles that do not comply with the applicable safety standards. Thus, although the Court has concluded that Chrysler did not violate sections 30112(a) or 30115 of the Safety Act, this conclusion does not necessarily relieve Chrysler of its duty under section 30118 to recall the subject vehicles which do not comply with FMVSS No. 210.

Chrysler argues that an order by this Court directing it to recall the subject vehicles under the circumstances of this case would be violative of the APA and due process. The Court disagrees. This is not a

---

22. A notification and remedy campaign is popularly referred to as a "recall," although that term does not appear in the Safety Act.

23. Section 30112 provides, in part, as follows:
   (a) General.—Except as provided in this section, sections 30113 and 30114 of this title, and subchapter III of this chapter, a person may not manufacture for sale, sell, offer for sale, introduce or deliver for introduction in interstate commerce, or import into the United States, any motor vehicle or motor vehicle equipment manufactured on or after the date an applicable motor vehicle safety standard prescribed under this chapter takes effect unless the vehicle or equipment complies with the standard and is covered by a certification issued under section 30115 of this title.
   (b) Nonapplication.—This section does not apply to—
   . . .
   (2) a person—
   (A) *establishing that the person had no reason to know, despite exercising reasonable care, that*

a motor vehicle or motor vehicle equipment does not comply with applicable motor vehicle safety standards prescribed under this chapter; . . . .
49 U.S.C. § 30112(a), (b)(2) (emphasis added).

24. Section 30115 provides as follows:

   Certification of compliance. A manufacturer or distributor of a motor vehicle or motor vehicle equipment shall certify to the distributor or dealer at delivery that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed under this chapter. A person may not issue the certificate if, *in exercising reasonable care*, the person has reason to know the certificate is false or misleading in a material respect. Certification of a vehicle must be shown by a label or tag permanently fixed to the vehicle. Certification of equipment may be shown by a label or tag on the equipment or on the outside of the container in which the equipment is delivered.
49 U.S.C. § 30115 (emphasis added).

case where Chrysler was unaware of its duty to test seat belt assembly anchorages with 3,000 pounds of force being applied to body blocks. Chrysler only challenges NHTSA's interpretation of the standard. In *Sentara–Hampton General Hosp. v. Sullivan,* 980 F.2d 749 (D.C.Cir.1992) (per curiam), this circuit held that the application of the agency interpretive rule did not amount to "retroactive application of substantive law." *Id.* at 760 (citing *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). Thus, because, as previously noted, the Court concludes that NHTSA's interpretation merely articulated with clarity the scope of a pre-existing duty already known to Chrysler, an order of a recall of the subject vehicles which fail to comply with FMVSS No. 210, a standard which has been in place and known by Chrysler since 1967, will not subject Chrysler to retroactive application of the standard. *See id.*

Chrysler also claims in a supplemental pleading filed subsequent to the oral argument on the pending motions, that a recall would require it to spend many thousands of dollars to change the seat belt anchorages in the subject vehicles. The Court notes, however, that in its memorandum in support of its motion for summary judgment, Chrysler, in assuring the Court that its challenge to NHTSA's noncompliance decision was not motivated by its desire to avoid an expensive notification and recall campaign, stated that "a recall of the subject vehicles would be relatively inexpensive and easy to accomplish." (Def.Mem. at 5.) The Court is not impressed by this litigation sleight of hand. However, even accepting Chrysler's changed position that a recall would be an expensive endeavor, the Court does not find that the potential expense associated with a recall to remedy a significant safety problem is a justification for allowing vehicles that do not comply with FMVSS No. 210 to remain in use by the general public.

Thus, because the Court concludes that the subject vehicles fail to comply with FMVSS No. 210, and that a recall order would not violate the APA or due process requirements, the Court, in the interest of public safety,[25] is of the opinion that a recall of the subject vehicles is appropriate.

## IV. CONCLUSION

In view of the foregoing, the Court concludes that plaintiff's interpretation of FMVSS No. 210 is permissible and that the subject vehicles fail to comply with the standard as interpreted by NHTSA. The Court also concludes that Chrysler was not provided with adequate notice of NHTSA's interpretation of FMVSS No. 210 at the time that Chrysler conducted its compliance tests of the subject vehicles and certified vehicular compliance with the relevant safety standards. Thus, at the time of testing and certification, Chrysler did not violate the Safety Act. Nonetheless, because the subject vehicles are currently not in compliance with the safety standards as interpreted by the agency charged with ensuring motor vehicle safety, the Court will **ORDER** Chrysler to notify owners, purchasers, and dealers of the noncompliance no later than March 30, 1998, and provide a remedy without charge. Accordingly, plaintiff's motion for summary judgment is **GRANTED** in part, and **DENIED** in part. Defendant's motion for summary judgment is **GRANTED** in part, and **DENIED** in part. An Order will issue with this Opinion.

---

**25.** The Court notes that the strength requirement is "intended to ensure that the safety belt system will remain attached to the vehicle and not break free, even when exposed to severe crash forces [throughout the life of the vehicle]." 55 Fed. Reg. 17,970, 17,981 (1990).