UNITED STATES of America, Appellee,

v.

CHRYSLER CORPORATION, Appellant.

Nos. 98–5047 and 98–5069.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1998.

Decided Oct. 30, 1998.

John G. Roberts, Jr. argued the cause for appellant. With him on the briefs were Gregory G. Garre and Erika Z. Jones. Lawrence S. Robbins entered an appearance.

Irene M. Solet, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, Douglas N. Letter, Appellate Litigation Counsel, U.S. Department of Justice, and Enid Rubenstein, Attorney, National Highway Traffic Safety Administration. Michael E. Robinson, Attorney, U.S. Department of Justice, entered an appearance.

Andrew D. Koblenz, Charles H. Lockwood, Alan Charles Raul and Thomas W. Merrill were on the brief for amici curiae American Automobile Manufacturers, et al. Daniel J. Popeo and Paul D. Kamenar entered appearances.

Before: EDWARDS, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.

EDWARDS, Chief Judge:

Under the National Traffic and Motor Vehicle Safety Act ("NTMVSA" or "Act"), the National Highway Traffic Safety Administration ("NHTSA") may seek the recall of a motor vehicle *either* when a vehicle has "a defect related to motor vehicle safety" *or* when a vehicle "does not comply with an applicable motor vehicle safety standard." 49 U.S.C. § 30118(b) (1994). These provisions are not mutually exclusive, nor are they coterminous. Thus, an allegation of noncompliance may or may not include a charge that a vehicle has a safety defect.

The instant case involves only an allegation of noncompliance. There is no claim here that the vehicles in question suffer from safety defects. The precise issue before the court is whether NHTSA must provide notice of what is required under a safety standard before seeking a recall under 49 U.S.C. § 30118 for noncompliance with that standard. We find that, in light of both the requirements of 49 U.S.C. §§ 30112 and 30115 and the due process clause, notice is required before a noncompliance recall may be ordered. Because there was no notice here, we reverse the District Court's recall order.

### I. BACKGROUND

On June 4, 1996, NHTSA filed this suit against Chrysler seeking, *inter alia,* a recall of approximately 91,000 Model Year 1995 Chrysler Cirrus and Dodge Stratus cars. NHTSA alleged that the cars in question did not comply with Federal Motor Vehicle Safety Standard 210 ("Standard 210"), which regulates seat belt assembly anchorages. *See* 49 C.F.R. § 571.210 (1997). On February 4, 1998, the District Court granted NHTSA's request and ordered a recall. *See United States v. Chrysler Corp.,* 995 F.Supp. 150 (D.D.C.1998). Vehicles manufactured after May 15, 1995 were not made subject to the recall, because "tapping plates" were added to reinforce the anchorages in these vehicles. *See id.* at 153 n. 5.

The promulgation of safety standards under the NTMVSA, 49 U.S.C. §§ 30101–30169, has been delegated to NHTSA. *See* 49 C.F.R. § 1.50(a) (1997). Pursuant to this authority, NHTSA adopted Standard 210, which requires seat belt assembly anchorages to withstand certain forces to ensure that seat belts will remain attached to the vehicle in the event of a crash. Anchorages must withstand two phases of a test procedure: First, they must be able to withstand force as it is increased to 3,000 pounds over thirty seconds. Second, after 3,000 pounds of force is reached, the anchorages must withstand that force for ten seconds. *See* 49 C.F.R. § 571.210 ¶ S5.2. The test procedures require the use of a "pelvic body block," an L-shaped metal block that represents a human pelvis. The standard, however, does not specify the placement of this block during testing. *See id.* ¶¶ S5, S5.2.

Chrysler tested the 1995 Cirrus and Stratus model designs for compliance with Standard 210 on November 8, 1993, by placing the pelvic body block against the seat back. Subsequently, in March 1995, Chrysler certified the 1995 Cirrus and Stratus cars. In July 1995, NHTSA hired General Testing Laboratories ("GTL") to conduct compliance testing on a number of vehicles, including a 1995 Chrysler Cirrus. When GTL performed the Standard 210 compliance test on the 1995 Cirrus, it placed the pelvic body block away from the rear seat back to prevent the seat buckles and webbing from breaking during the test; this was done instead of replacing the original belt webbing with wire rope, as Standard 210 allows. When testing was done with the pelvic body block placed away from the rear seat back, the anchorage on one of the rear seat belts failed after approximately 24 seconds with 2,829 pounds of applied force.

NHTSA notified Chrysler of the failure and requested that Chrysler institute a recall. Chrysler performed its own tests in August 1995, simulating the testing done by GTL, and its results were similar to those of GTL, i.e., the anchorages failed when the pelvic body block was placed forward of the seat back. See Joint Appendix ("J.A.") 105. Thus, Chrysler did not argue that GTL's test results were in error. Rather, Chrysler claimed that GTL's decision to place the pelvic body block forward of the seat back, rather than replace the seat belt webbing, was the cause of the test failure. In other words, Chrysler asserted that it had followed permissible test procedures and had satisfied the requirements of Standard 210 using these procedures, so it did not matter whether GTL reached different results using different test procedures. Chrysler therefore refused to institute a recall.

In December 1995, NHTSA officials acknowledged that neither Standard 210 nor the laboratory test procedures developed by the Office of Vehicle Safety Compliance specified a position for the pelvic body block. See J.A. 129. However, NHTSA asserted that, pursuant to a 1991 Federal Register notice, manufacturers must pass the strength test "with the safety belt and other vehicle fea-

tures at any adjustment" whenever a standard does not indicate the specific test conditions. See 56 Fed.Reg. 63,676, 63,677 (1991). NHTSA thus suggested that Chrysler was on notice that it might be required to satisfy Standard 210 using the test procedures employed by GTL.

After a notice of noncompliance and a public hearing, NHTSA issued a final decision in June 1996. See 49 U.S.C. § 30118(b). NHTSA ordered Chrysler to notify owners, purchasers, and dealers of the noncompliance no later than July 8, 1996, and to provide a remedy without charge. Chrysler refused and NHTSA filed this action, alleging that Chrysler had violated §§ 30112(a) and 30115 of the Act and requesting that the District Court order a recall and award civil penalties.

On cross-motions for summary judgment, the District Court first sought to determine NHTSA's exact interpretation of Standard 210. This was no mean feat, because NHTSA had articulated its interpretation "in different ways." See United States v. Chrysler Corp., 995 F.Supp. at 155 & n. 8. The District Court finally concluded that "NHTSA's interpretation of [Standard 210] is that vehicles must comply with [Standard 210] when tested with the pelvic body block in any position that would extend the lap belt to accommodate a 50th percentile 6–year–old to a 95th percentile adult male." Id. at 155. The testing range cited by the District Court is nowhere to be found in Standard 210; rather, it is taken from Standard 208. See 49 C.F.R. § 571.208 ¶ S7.1.1 (1997). In any event, neither party disputes that the District Court's statement is an accurate description of NHTSA's current interpretation of Standard 210.

The District Court found that, because Chrysler had exercised reasonable care, it had not violated § 30112(a) of the Act, which prohibits the manufacture of a vehicle that does not comply with the applicable standards. The trial court also found that Chrysler had not violated § 30115, which prohibits the certification of a vehicle that is not in compliance with all applicable standards. Most importantly, the District Court held that a manufacturer exercising reason-

able care would not have "been able to identify with *ascertainable certainty* that vehicles must comply with [Standard 210] when tested with the pelvic body block in any position that would extend the lap belt to accommodate a 50th percentile 6–year–old to a 95th percentile adult male, i.e., with the pelvic body block positioned between 2 to 6.5 inches from the seat back." *See United States v. Chrysler Corp.*, 995 F.Supp. at 162.

The District Court then went on to hold that a recall could be ordered without regard to whether Chrysler had reasonable notice of the standard giving rise to the alleged noncompliance. Because the 1995 cars here at issue did not comply with NHTSA's current interpretation of Standard 210, the District Court ordered Chrysler to notify owners, purchasers, and dealers of the noncompliance by March 30, 1998, and to provide a remedy without charge. *See id.* at 163–164; *United States v. Chrysler Corp.*, 995 F.Supp. 150 (D.D.C.1998), *reprinted in* J.A. 260–61. After a panel of this court denied Chrysler's emergency motion to stay the District Court's recall order, Chrysler initiated a recall process by notifying owners, purchasers, and dealers of the alleged noncompliance, offering to provide a remedy at no charge, and submitting a "Noncompliance Information Report" to NHTSA. Chrysler has not, however, completed all that is required under the recall order.

## II. Analysis

### A. Mootness

■ The Government suggests that we need not reach the merits of this case, because, in light of Chrysler's recall of some of the cars at issue, the appeal is moot. Chrysler responds that the appeal is not moot, because it has not completed all that is required by the recall order. Chrysler has the better of this argument. Given the present posture of the case, it is clear that this appeal is not moot.

■ "[A]n appeal should ... be dismissed as moot when, by virtue of an intervening event, a court of appeals cannot grant 'any effectual relief whatever' in favor of the appellant." *Calderon v. Moore*, 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)). However, "even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'" *Id.* (quoting *Church of Scientology v. United States*, 506 U.S. 9, 13, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). The question, then, is whether this court can grant Chrysler any relief at all.

Chrysler points out that this court may grant relief because, even though we cannot "return the parties to the *status quo ante*," *see Church of Scientology*, 506 U.S. at 12, 113 S.Ct. 447, a ruling in Chrysler's favor would allow it to avoid the remaining obligations under the District Court's order. In particular, Chrysler seeks to avoid fixing vehicles that have not yet been repaired and submitting "Quarterly Reports" to NHTSA regarding the progress of repairs. If Chrysler prevails on the merits, it will avoid these obligations imposed by the District Court, as well as any monetary penalties that might be sought for the alleged violations of the Act. In other words, Chrysler asserts that there is still substantial relief that can be afforded by this court, thus defeating any suggestion that the appeal is moot. We agree.

NHTSA argues that the decision in *United States v. Ford Motor Co.*, 574 F.2d 534 (D.C.Cir.1978), requires a finding that Chrysler's appeal was rendered moot as soon as the company initiated a recall. In *Ford*, the manufacturer initiated a recall when it could not agree with NHTSA on the proper recall notice for car owners. *See id.* at 538. The court then found that the appeal was moot, because Ford had "unilaterally instituted a final recall." *Id.* at 539–40. The present case is readily distinguishable in that Chrysler did not undertake any recall action voluntarily, but rather was ordered by the District Court (with a stay denied by this court) to recall the cars. *See* 13A Charles Alan Wright et al., Federal Practice and Procedure § 3533.2, at 250 (1984) ("An order that expressly controls future conduct is not mooted by compliance during the period required to complete an appeal...."). In any event, to the extent that our decision in *Ford* gives pause, the subsequent decisions by the

Supreme Court in *Calderon* and *Church of Scientology* are controlling. The availability of a partial remedy for Chrysler is sufficient to prevent this case from being moot.

### B. The Requirement of "Fair Notice"

■ As noted above, under the Act, NHTSA may seek recall of a motor vehicle, *either* when a vehicle has "a defect related to motor vehicle safety" *or* when a vehicle "does not comply with an applicable motor vehicle safety standard." 49 U.S.C. § 30118(b). An allegation of *noncompliance* may or may not include a charge that a vehicle has a safety defect. In this case, the District Court's recall order was based solely on NHTSA's claim that approximately 91,000 of Chrysler's vehicles did not comply with Standard 210. NHTSA has never contended that the Chrysler cars in question have a "defect related to motor safety" that would warrant a recall. Indeed, the Government does not even claim that Chrysler's alleged breach of Standard 210 resulted in the manufacture of inherently unsafe vehicles.

The principal issue before this court is whether NHTSA must give reasonable notice of what is required by a safety standard, such as Standard 210, before seeking a recall under 49 U.S.C. § 30118 on the ground that a manufacturer has failed to comply with the standard. The simple answer to this question, at least where there is no safety defect at issue, is that a manufacturer cannot be found to be out of compliance with a standard if NHTSA has failed to give fair notice of what is required by the standard. And absent notice, there can be no recall based solely on noncompliance.

In *General Electric Co. v. EPA*, 53 F.3d 1324, 1328, 1333 (D.C.Cir.1995), we held that, because "[d]ue process requires that parties receive fair notice before being deprived of property," the Environmental Protection Agency ("EPA") could not penalize General Electric for asserted regulatory violations when General Electric lacked "fair warning of [EPA's] interpretation of the regulations." We made it clear that, "[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not

deprive a party of property," particularly when "the interpretation is so far from a reasonable person's understanding of the regulations that they could not have fairly informed [the regulated party] of the agency's perspective." *Id.* at 1328, 1330; *see also Rollins Envtl. Servs. Inc. v. EPA*, 937 F.2d 649, 652 n. 2 (D.C.Cir.1991)("[A] regulation carrying penal sanctions must give fair warning of the conduct it prohibits or requires.") (citation omitted); *id.* at 654 n. 1 (Edwards, J., dissenting in part and concurring in part) ("It is basic hornbook law in the administrative context that 'the application of a regulation in a particular situation may be challenged on the ground that it does not give fair warning that the allegedly violative conduct was prohibited.'") (citation omitted); *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C.Cir.1987) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule."); *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C.Cir.1986) ("[T]he due process clause prevents ... the application of a regulation that fails to give fair warning of the conduct it prohibits or requires.").

NHTSA does not deny the viability of the "fair notice" doctrine. Yet, the Government suggests that notice is not required to compel compliance with standards under the Act. We fail to comprehend this argument and the Government offers no coherent defense of its position. The simple truth is that there is no real difference between "violating" a regulation, for which notice is required, and "not complying" with a regulation, for which NHTSA argues notice is not required. Thus, Chrysler cannot be required to recall cars for noncompliance with Standard 210 if it had no notice of what NHTSA now says is required under the standard.

NHTSA also argues that the recall order does not raise due process concerns, because this court has only found due process violations in those cases involving "explicit penalties or actions that the Court described as punitive in some manner." Brief for the Appellee at 57. But a recall, which entails the expenditure of significant amounts of

money, deprives Chrysler of property no less than a fine. We have little doubt that a recall is a "sufficiently grave sanction" such that the duty to provide notice is triggered. *See Satellite Broad.*, 824 F.2d at 3.

Furthermore, it is noteworthy that the Act itself provides that, before a manufacturer can be found to have manufactured a non-complying vehicle, NHTSA must show that a reasonable person, exercising reasonable care, would have known that the vehicle did not comply with the applicable standards. *See* 49 U.S.C. § 30112(b)(2)(A) (1994). Moreover, a manufacturer does not violate § 30115 of the Act by certifying a vehicle as complying with all applicable standards if it had no reason to know, in exercising reasonable care, that the vehicle did not comply with the applicable safety standards. *See* 49 U.S.C. § 30115 (1994). These statutory provisions merely reinforce the well-established rule in administrative law that the application of a rule may be successfully challenged if it does not give fair warning that the allegedly violative conduct was prohibited.

In light of both the notice requirements of §§ 30112 and 30115 and the due process clause, we find that Chrysler was owed fair notice before it could be ordered to recall vehicles for alleged noncompliance with a standard under the Act. The only remaining question is whether NHTSA provided Chrysler with the requisite notice.

## C. Notice of Pelvic Body Block Placement

■ The District Court concluded that "Chrysler was not provided sufficient notice of NHTSA's recently articulated interpretation of [Standard 210]." *United States v. Chrysler Corp.*, 995 F.Supp. at 162. NHTSA argues, however, that Chrysler should have known to place the pelvic body block between 2 to 6.5 inches from the seat back when testing for compliance under Standard 210.

■ NHTSA is free to dispute the District Court's finding on notice without filing a cross-appeal. *See United States v. American Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924) ("[T]he appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it."); *Freeman v. B & B Assocs.*, 790 F.2d 145, 151 (D.C.Cir.1986) ("An appellate court ... will freely consider any argument by an appellee that supports the judgment of the district court including arguments rejected by the district court and even arguments contradicting the logic of the district court. Only when an appellee attempts to overturn or modify a district court's judgment must the appellee file a cross-appeal."). So we will entertain the Government's argument that the District Court was in error in concluding that Chrysler did not have fair notice.

We begin with the language of Standard 210 to determine whether "a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expect[ed] parties to conform." *General Elec.*, 53 F.3d at 1329. As noted above, NHTSA acknowledged in a December 1995 letter to Chrysler that neither Standard 210 nor the laboratory test procedures for Standard 210 indicate the proper placement of the pelvic body block during compliance testing. *See* J.A. 129. However, NHTSA relies on a 1991 Federal Register notice to support its claim that Chrysler had fair notice. That 1991 notice provides, in relevant part, that,

[a]s a general matter, when a standard does not specify a particular test condition, there is a presumption that the requirements of the standard must be met at all such test conditions. This presumption that the standard must be met at all positions of unspecified test conditions may be rebutted if the language of the standard as a whole or its purposes indicate an intention to limit unspecified test conditions to a particular condition or conditions.

In the case of the strength requirements in Standard No. 210, nothing in the language of the standard suggests that the strength requirements were only to be measured with the safety belt or other vehicle features at certain adjustment positions. Indeed, the purpose of the standard is to reduce the likelihood that an anchor-

age will fail in a crash. To serve this purpose, the anchorage must be capable of meeting the strength requirements with the safety belt and other vehicle features at any adjustment, since those features could be at any adjustment position during a crash.

56 Fed.Reg. 63,676, 63,677.

NHTSA asserts that it is irrelevant that the pelvic body block placement was not discussed in the 1991 notice. Rather, NHTSA argues that the 1991 notice reflects the agency's general policy and the phrase "must be capable of meeting the strength requirements with the safety belt and other vehicle features at any adjustment" has a discernible bearing on the placement of the pelvic body block during compliance testing. Thus, according to NHTSA, Chrysler could have determined what NHTSA now views as the proper placement of the pelvic body block simply by applying this general policy notice when it performed its Standard 210 compliance testing.

NHTSA also argues that Chrysler should have known that the compliance test must be performed with the pelvic body block in any position that would extend the lap belt to accommodate a 50th percentile six-year-old and a 95th percentile adult male. The notice for this testing requirement, claims NHTSA, is readily apparent from another safety standard, Standard 208.

On the record at hand, we disagree with the Government's claim that Chrysler should have been able to discern what NHTSA now says is the correct pelvic body block placement for Standard 210 compliance testing. The 1991 notice did not even discuss pelvic body block placement. Moreover, the language of the 1991 notice that NHTSA relies on is far too general to suggest that Chrysler should have looked to another standard, Standard 208, in order to determine the proper placement under Standard 210. Before Chrysler could be required to perform Standard 210 compliance testing with the pelvic body block in any position that would accommodate a 50th percentile six-year-old and a 95th percentile adult male, NHTSA must have either put this language into Stan-

dard 210 itself, or at least referenced this language in Standard 210.

In addition, NHTSA's own test schematic for Standard 210, entitled "Typical FMVSS 210 Anchorage Pull Test Setup," shows the pelvic body block against the seat back, not forward of it. *See* J.A. 141, 156. And as the District Court found, NHTSA itself had tested for compliance with Standard 210 with the pelvic body block against the seat back. *See United States v. Chrysler Corp.*, 995 F.Supp. at 162 n. 20. NHTSA's only response is that manufacturers may not rely on NHTSA's own test procedures and practices to ensure compliance with a standard. However, an agency is hard pressed to show fair notice when the agency itself has taken action in the past that conflicts with its current interpretation of a regulation. *Cf. General Elec.*, 53 F.3d at 1332 ("While we accept EPA's argument that the regional office interpretation was wrong, confusion at the regional level is yet more evidence that the agency's interpretation of its own regulation could not possibly have provided fair notice.").

Furthermore, the Standard 210 test procedures allow contractors to replace the seat buckles if there is a risk of breakage. *See* Laboratory Test Procedure for FMVSS No. 210, at 19, *reprinted in* J.A. 55; 49 C.F.R. § 571.210 ¶ S5. As the District Court pointed out, "the risk of seat belt buckle breakage occurs if a test vehicle's original seat belts are used and the pelvic body block is placed directly against the seat back," and, thus, "[a]t the very least, [paragraph S5 and the test procedures] suggest that testing with the pelvic body block against the seat back is within the permissible range of positions." *United States v. Chrysler Corp.*, 995 F.Supp. at 162.

Finally, it should be noted that NHTSA's most recent interpretation of Standard 210, regarding the positioning of the pelvic body block, no more simulates the real world conditions of a vehicle crash than does placing the block against the seat back as Chrysler did. In fact, the positioning of the pelvic body block during the GTL testing did not even fall within the Standard 208 range that NHTSA now argues governs pelvic body block placement for Standard 210 compliance

testing. The GTL testing only fell within the belt length payout (the position on the seat forward of the seat back) called for by the Standard 208 range, but not the corresponding height and angle. NHTSA's response is that "[t]o have tested with the body block in the forward *and* raised position ... would have required additional test equipment not contemplated by Standard 210." Brief for the Appellee at 37 n.11. In other words, according to NHTSA, Chrysler not only should have known that it must look to Standard 208 for the proper pelvic body block range, it also should have known to use only one of the dimensions specified in that range when performing Standard 210 compliance testing. Chrysler might have satisfied NHTSA with the exercise of extraordinary intuition or with the aid of a psychic, but these possibilities are more than the law requires.

Because we find that NHTSA failed to provide adequate notice of what it now believes is the appropriate pelvic body block placement when testing for compliance under Standard 210, Chrysler cannot be compelled to recall its 1995 Cirrus and Stratus cars.

### III. CONCLUSION

For the reasons set forth above, the judgment of the District Court is reversed.

*So ordered.*