# United States Court of Appeals for the Federal Circuit

04-1618, 05-1274

FUJI PHOTO FILM CO., LTD.,

Appellant,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee.

-------------------------------------------------

JACK BENUN,

Appellant,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee.

Lawrence Rosenthal, Stroock & Stroock & Lavan, LLP, of New York, New York, argued for appellant Fuji Photo Film Co., LTD.  With him on the brief were Matthew W. Siegal and Angie M. Hankins.

George W. Thompson, Neville Peterson LLP, of Washington, DC, argued for appellant Jack Benun.  With him on the brief were John M. Peterson and Michael T. Cone.

Mark B. Rees, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee.  With him on the brief were James M. Lyons, Deputy General Counsel, Andrea C. Casson, Assistant General Counsel, and Jonathan Engler, Attorney.   Of counsel were Rodney G. Maze and Timothy P. Monaghan, Attorneys.

Appealed from:  United States International Trade Commission

# United States Court of Appeals for the Federal Circuit

04-1618, 05-1274

FUJI PHOTO FILM CO., LTD.,

Appellant,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee.

--------------------------------------------------

JACK BENUN,

Appellant,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee.

_____

DECIDED:  January 11, 2007

_____

Before LOURIE, SCHALL, and DYK, Circuit Judges.

DYK, Circuit Judge.

Appellants Fuji Photo Film Co., Ltd. ("Fuji") and Jack Benun ("Benun"), one of the principals of Jazz Photo Corp. ("Jazz"), separately appeal the International Trade Commission's ("Commission") final determination concerning civil penalties for violation of a cease and desist order issued to Jazz and "its principals, stockholders, officers, directors, employees, [and] agents."  The cease and desist order barred Jazz from

importing (or selling, marketing, advertising, distributing, etc. previously imported) disposable cameras that infringed fifteen of Fuji's patents. The central questions before the Commission were whether: (1) the cameras were first sold abroad (making their refurbishment infringing regardless of whether they were repaired or reconstructed); and (2) whether the processes Jazz used to refurbish the cameras first sold in the United States constituted permissible repair or impermissible reconstruction. Fuji challenges the order on the ground that the Commission erred in finding that certain of Jazz's lens-fitted film packages ("LFFPs" or "cameras") were permissibly repaired. On appeal Benun, the principal consultant and later Chief Operating Officer ("COO") of Jazz, challenges the order insofar as it imposes civil penalties.

We conclude that Fuji lacked standing to bring this appeal. With respect to Benun's appeal, we conclude that the Commission had the authority to issue an order against Benun; that the order applied to Benun; and that adequate notice was provided that the order applied to Benun. We also hold that substantial evidence supports the finding that the majority of the cameras were first sold abroad and that, while the Commission did not err in finding impermissible reconstruction with respect to most of the cameras first sold in the United States, the Commission erred in ruling that the replacement of the full backs constituted impermissible reconstruction.

We therefore affirm-in-part, reverse-in-part, and remand to the Commission for a recalculation of the appropriate civil penalty.

BACKGROUND

Cases arising from the same factual background have been before this court four other times. See Jazz Photo Corp. v. United States, 439 F.3d 1344 (Fed. Cir. 2006)

04-1618, 05-1274 2

("Jazz II"); Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368 (Fed. Cir. 2005) ("Fuji II"); Fuji Photo Film Co. v. Int'l Trade Comm'n, 386 F.3d 1095 (Fed. Cir. 2004) ("Fuji I"); Jazz Photo Corp. v. Int'l Trade Comm'n, 264 F.3d 1094 (Fed. Cir. 2001) ("Jazz I"). We will therefore only recite the facts most relevant to the present appeal.

I

Fuji is the owner of fifteen patents directed at LFFPs", popularly known as disposable, single use, or one time use cameras. Fuji and its licensees, Eastman Kodak Co. and Konica Corp., manufacture and sell LFFPs. The LFFP consists of a plastic shell that is encased in a cardboard cover and equipped with a button-activated shutter, a lens, a viewfinder, a film advance mechanism, and optional flash units and buttons. The LFFP is preloaded with both film and a film cartridge into which the exposed film winds. The typical consumer of these inexpensive cameras brings the entire LFFP to a film processor to be developed and receives back only the negatives and prints, but not the LFFP itself. During the period in question Jazz collected used LFFP shells originally made by Fuji or its licensees, inserted new film and otherwise refurbished the shells, and sold them in the United States. Some of the shells that Jazz collected were originally sold by Fuji and its licensees in the United States, while others were first sold abroad.

The Commission has the authority to conduct investigations into imported goods that allegedly infringe United States patents and impose remedies if products are found to be infringing. 19 U.S.C. § 1337(a)(1)(B), (b)(1), (d), (f) (2004). When conducting an investigation of allegedly infringing products, the Commission in general considers the same liability issues as a district court would in a private infringement suit.

The Commission may impose two remedies if an imported product is found to be infringing. First, it may issue either a general or limited exclusion order directing U.S. Customs and Border Protection ("Customs") to bar entry of infringing products. Limited exclusion orders only apply to the specific parties before the Commission in the investigation. 19 U.S.C. § 1337(d). General exclusion orders bar the importation of infringing products by anyone, regardless of whether they were a respondent in the Commission's investigation. Id. A general exclusion order may only be issued if: 1) necessary to prevent circumvention of a limited exclusion order; or 2) necessary to prevent a pattern of violation where it is difficult to identify the source of infringing products. Id. Exclusion orders are directed solely to Customs. Id.

Second, the Commission may issue a cease and desist order to a specific party barring importation and other activities, such as sales and distribution of imported products that infringe. 19 U.S.C. § 1337(f)(1). If the Commission finds that a party covered by a cease and desist order has violated the order, the Commission may impose civil penalties. 19 U.S.C. § 1337(f)(2).

II

On March 25, 1998, the Commission instituted an investigation against twenty-seven respondents that imported and sold LFFPs, including Jazz, to determine whether they were violating one or more claims of Fuji's fifteen patents. The Commission found that Jazz and other respondents were infringing the patents unless the respondents' activities involved permissible repair. Thus, a central issue was whether cameras first sold in the United States were permissibly repaired or impermissibly reconstructed. The Commission held that the respondents had the burden of proof on this issue. To some

extent, the Commission found that the respondents had failed to satisfy their burden because they had not supplied complete information about their refurbishment processes, which occurred abroad. However, the Commission also identified eight common steps that Jazz and some additional respondents admitted utilizing. The Commission concluded that these eight common steps constituted impermissible reconstruction.[1]

On June 2, 1999, the Commission imposed a general exclusion order barring entry of cameras that infringed Fuji's patents. The exclusion order was written in general terms, simply barring importation of LFFPs "covered by one or more" of the identified claims of the fifteen Fuji patents. On the same day the Commission issued a cease and desist order barring Jazz from importing infringing cameras or engaging in a variety of activities related to imported LFFPs, including selling, marketing, and advertising infringing imported LFFPs. By its terms, this order was applicable to Jazz's "principals, stockholders, officers, directors, employees, agents, licenses [sic], distributors, controlled (whether by stock ownership or otherwise) and/or majority owned business entities, successors, and assigns, and to each of them, insofar as they are engaging in conduct . . . for, with, or otherwise on behalf of [Jazz]." J.A. at 2661-62. Like the exclusion order, the cease and desist order was general, merely prohibiting importation, sale, marketing, etc. of LFFPs "that infringe one or more" of the identified

---

[1] The eight steps were: 1) removing the cardboard cover; 2) opening the LFFP body; 3) replacing the winding wheel or modifying the film cartridge to be inserted; 4) resetting the film counter; 5) replacing the battery in flash LFFPs; 6) winding new film out of a canister onto a spool or into a roll; 7) resealing the LFFP body using tape and/or glue; 8) applying a new cardboard cover.

claims of Fuji's fifteen patents. Cease and desist orders were also issued to other importers.

Jazz and some other respondents appealed the imposition of the general exclusion and cease and desist orders to this court. We first concluded that the eight steps considered by the Commission constituted permissible repair and therefore reversed "[f]or those respondents[] [whose] activities . . . were shown to be limited to those steps considered by the [Administrative Law Judge ("ALJ")]." See Jazz I, 264 F.3d at 1109. We held that the "record contain[ed] insufficient basis on which to reverse the Commission's rulings" for "those respondents who refused to provide discovery or access, or proffered incomplete or 'bench' evidence (a partial display created for litigation purposes)." Id. Finally, we declined to rule on what processes beyond the eight considered by the Commission would constitute permissible repair, stating that "[w]e can not exculpate unknown processes from the charge of infringing reconstruction." Id.

Following our decision the Commission solicited comments from affected parties as to what action it should take on remand. None of the respondents was able to convince the Commission that it should be excluded from the general exclusion order or that a cease and desist order should be withdrawn. The Commission did not modify or clarify any of its orders. Indeed, the Commission specifically rejected Fuji's request that the Commission clarify the scope of permissible repair in light of Jazz I. It stated that "[a]ny interpretation of the Jazz [I] decision by the Commission will be made in the context of a proceeding before the Commission. Issues that arise concerning the interpretation of the Jazz [I] decision in the context of the enforcement of the general

exclusion order are properly resolved, in the first instance, by the U.S. Customs Service." J.A. at 2701-02.[2]

## III

The present litigation arises out of an enforcement proceeding instituted by the Commission on September 24, 2002, to investigate Fuji's allegation that Jazz, Benun, and Jazz's then-president and Chief Executive Officer Anthony Cossentino violated the cease and desist order by importing and selling infringing LFFPs during the period after the Jazz I decision. On April 6, 2004, the ALJ issued his initial determination. He first concluded that Jazz imported and sold 27 million LFFPs covered by at least one claim of Fuji's asserted patents from August 21, 2001, to December 12, 2003. Relying on Jazz I, he then set forth a two-part test defining permissible repair: 1) proof that the cameras were first sold in the U.S. so as to exhaust U.S. patent rights; 2) proof that the cameras were repaired rather than reconstructed.

Since Jazz's refurbishment of LFFPs apparently occurred entirely abroad, there were evidentiary problems in determining whether the patent rights were exhausted, i.e., whether the cameras were first sold in the United States. Ultimately, the ALJ concluded that 40% (10,783,092) of the LFFPs were first sold abroad and therefore infringed because they failed the first prong of the permissible repair defense; he also

---

[2] In a related proceeding the Commission did construe certain claims of Fuji's patents; on appeal we sustained most of its claim construction rulings. Fuji I, 386 F.3d at 1108. In 2004, the Court of International Trade sustained-in-part and reversed-in-part Jazz's appeal from Custom's denial of entry of certain LFFPs. The Court of International Trade found some cameras permissibly repaired but a lack of evidence to establish the repair defense for the rest, and we affirmed. Jazz II, 439 F.3d at 1348, 1358.

concluded that 60% (16,174,638) were first sold in the United States and satisfied the exhaustion prong.

For the 60% of LFFPs with exhausted patent rights the ALJ next considered the repair-reconstruction issue and held that this court in Jazz I did not limit permissible repair to the eight steps. However, the ALJ concluded that Jazz had failed to prove its permissible repair defense for the 15,957,730 LFFPs sold in 2001 and 2002 because it failed to offer credible evidence of its processes. With respect to three categories of cameras with exhausted patent rights sold in 2003, the ALJ concluded that the evidence was sufficient to render a decision on the repair issue. First, the ALJ concluded that 742,500 LFFPs refurbished using a nineteen step process[3] shown in authenticated videotapes were permissibly repaired. Second, the ALJ concluded that the 998,250 Kodak LFFPs that were refurbished with partial new back covers ("half backs") (in addition to the nineteen step process) were permissibly repaired. Third, the ALJ concluded that 998,250 Kodak LFFPs that received complete new back covers ("full backs") (in addition to the nineteen step process) were impermissibly reconstructed.

---

[3] The steps are: 1) testing the battery; 2) breaking the weld so that the camera can be opened; 3) opening the camera's back; 4) disengaging the film advance disabling mechanism; 5) inserting the battery in the camera; 6) cleaning the viewfinder and taking lens; 7) testing the flash; 8) resetting the film counter; 9) inserting the film cartridge and securing the back closed; 10) applying black tape to areas where potential light leakage may occur; 11) inserting a "slider" to allow film to be reloaded with its back cover closed; 12) inserting a small rod to prevent errant pictures from being taken during refurbishing; 13) inserting a film winding shaft into the film roll chamber; 14) unwinding the film out of the film cartridge and into the film roll; 15) disconnecting the film winding shaft; 16) closing the film access door and applying black tape thereto; 17) applying additional black tape to areas where potential light leakage may occur; 18) testing the film advance and flash; and 19) placing the outer cardboard packaging onto the LFFP.

Overall, the ALJ found that 1,740,750 of the 27 million LFFPs imported and sold during the relevant period were permissibly repaired (742,500 through the nineteen step process and 998,250 by receiving half backs). By contrast, the ALJ found that Jazz had failed to carry its burden to show permissible repair for all 15,957,730 LFFPs sold in 2001 and 2002 because they either had unexhausted patent rights or there was insufficient evidence of the processes used. In addition, he found that Jazz had not shown permissible repair for 9,259,250 LFFPs sold in 2003 (4,400,000 with unexhausted patent rights; 3,861,000 for which there was insufficient evidence of the processes used; and 998,250 which received full backs).

The ALJ then imposed a civil penalty of $13,675,000 on Jazz. He also imposed a $154,000 penalty on Cossentino and held Benun, as the more culpable of the two, jointly and severally liable for the entire $13 million penalty imposed on Jazz. In doing so, he rejected Benun and Cossentino's argument that they were not personally bound by the order and that the penalty violated their due process rights.

On July 27, 2004, the Commission declined to review the ALJ's violation determinations, but determined to review the ALJ's penalty determination. On review, the Commission accepted the ALJ's penalty findings as to Jazz and Benun, but reduced Cossentino's penalty to $119,750.

Fuji, Jazz, Benun, and Cossentino all timely appealed to this court. Jazz and Cossentino reached a settlement with the Commission and withdrew their appeals. We have jurisdiction over Fuji and Benun's appeals pursuant to 28 U.S.C. § 1295(a)(6) (2000).

DISCUSSION

04-1618, 05-1274                    9

I

On appeal Fuji contends that the Commission erred in concluding that 1.7 million of the 27 million LFFPs in issue were permissibly repaired. Specifically, it argues that Kodak LFFPs that received partial new backs and LFFPs that were refurbished without spools should have been found to be infringing.

We have an obligation to assure ourselves of our jurisdiction before considering the merits of an appeal. See DaimlerChrysler Corp. v. Cumo, 126 S. Ct. 1854, 1860 (2006). We plainly have jurisdiction over Benun's appeal since he is appealing the imposition of civil penalties against him. However, we conclude that we lack jurisdiction over Fuji's appeal.

For a litigant to have standing under Article III of the Constitution, "a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). Because Article III standing is jurisdictional, this court must consider the issue sua sponte even if not raised by the parties. Pandrol USA, LP v. Airboss Ry. Prods., Inc., 320 F.3d 1354, 1367 (Fed. Cir. 2003). The party invoking federal jurisdiction bears the burden of establishing the elements required for Article III standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

Fuji challenges the Commission's underlying findings in its determination in a civil penalty proceeding. It is not clear that the Commission would be required to impose additional penalties if Fuji were successful in its contention that the Commission erred in its determination that 1.7 million of the 27 million LFFPs in issue were permissibly repaired. But even if it would impose additional penalties, any civil penalty collected

04-1618, 05-1274                    10

would go to the United States, not to Fuji. See 19 U.S.C. § 1337(f)(2). The Supreme Court has recognized that "private plaintiffs, unlike the Federal Government, may not sue to assess [civil] penalties for wholly past violations." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 188 (2000). However, "[t]o the extent that [civil penalties] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct." Id. at 186. Thus, Fuji has no standing to challenge the Commission's penalty determinations unless the civil penalties are "for violations that are ongoing at the time of the complaint and that could continue into the future if undeterred." Id. at 188.

There is no threat here of on-going violations. In this case Jazz no longer conducts business. Jazz filed for bankruptcy in 2003 and was ordered to cease business operations by March 1, 2005, and there is no suggestion that Jazz itself did not do so. Notice of Proposed Settlement of Controversy at 1, In re Jazz Photo Corp., No. 03-26565 (Bankr. D. N.J. Feb. 9, 2006). Jazz is in the process of being liquidated under Chapter 11 of the Bankruptcy Code. Since Jazz has not operated since early 2005, violations of the cease and desist order by it are neither ongoing nor will they continue in the future if undeterred. Likewise, there is no risk of on-going or future violations of the cease and desist order by Benun. Even if he were to import or sell infringing cameras, he would not be violating the cease and desist order because (as discussed below) the order only prohibited such conduct by Benun if it was "for, with, or

04-1618, 05-1274                                11

otherwise on behalf of" Jazz. Since Jazz no longer conducts business, Benun cannot import or sell cameras "for, with, or otherwise on behalf of" it.[4]

Fuji argues that "an ITC determination has the practical effect of directing the action of Customs [under the general exclusion order], thereby controlling which cameras will be excluded and which will be entered." Reply Br. for Appellant Fuji Photo Film Co., Ltd. at 4. But this appeal does not concern the general exclusion order or its scope. Moreover, since Jazz has ceased operations, there is no continuing or future need for Customs to decide which Jazz cameras will be excluded and which will be entered. Thus, at most this case could produce an interpretation of the <u>cease and desist</u> order directed only to Jazz (and Benun) which could affect the interpretation of the <u>exclusion</u> order directed generally to all importers. Such a stare decisis effect alone does not confer standing to appeal.[5] If Fuji wants the general exclusion order clarified, its appropriate remedy is to seek modification or clarification of the order by the

---

[4] According to Fuji, Benun continues to import infringing cameras through a new corporation he formed that purchased Jazz's assets in the bankruptcy sale. However, Fuji has not demonstrated that this new corporation would be bound by the cease and desist order issued against Jazz as a successor corporation. <u>See</u> <u>Golden State Bottling Co. v. Nat'l Labor Relations Bd.</u>, 414 U.S. 168 (1973).

[5] <u>See</u> <u>Sea-Land Serv., Inc. v. Dept. of Transp.</u>, 137 F.3d 640, 648 (D.C. Cir. 1998); <u>see also</u> <u>N.Y. Tele. Co. v. Maltbie</u>, 291 U.S. 645, 645 (1934); <u>see generally</u> Charles Alan Wright et al., <u>Federal Practice & Procedure</u> § 3902 (2d ed. 1991). The very cases on which Fuji relies confirm this. <u>See</u> <u>Surface Tech., Inc. v. Int'l Trade Comm'n</u>, 780 F.2d 29, 30 (Fed. Cir. 1985) (alleged infringer lacks standing to challenge a Commission finding that certain requirements of Section 1337 were satisfied when the non-infringement finding made the alleged infringer the prevailing party); <u>Krupp Int'l, Inc. v. Int'l Trade Comm'n</u>, 626 F.2d 844, 846 (C.C.P.A. 1980) (alleged infringer lacks standing to separately appeal a finding that the patent was valid when the Commission's finding of non-infringement made the alleged infringer the prevailing party); <u>Am. Tel. & Tel. Co. v. Int'l Trade Comm'n</u>, 626 F.2d 841, 842 (C.C.P.A. 1980) (same).

Commission in a proceeding in which affected parties would have the opportunity to participate.[6]  If the ITC refused to modify or clarify the order, Fuji might then have standing to appeal to this court.[7]  However, it may not seek an advisory opinion from this court in this case on the repair-reconstruction issue when it has not established that this appeal presents an Article III case or controversy.

II

We turn to Benun's appeal.  Benun first argues that the Commission lacked the authority to impose civil penalties on him because it lacked the authority to issue a cease and desist order against him.  See 19 U.S.C. § 1337(f)(1)-(2).  According to Benun, 19 U.S.C. § 1337(f)(2) only allows the imposition of civil penalties on a person to whom a cease and desist order has been duly issued.  Further, he argues, a cease and desist order can only be issued to a "person violating [section 1337], or believed to be violating [section 1337]."  19 U.S.C. § 1337(f)(1).  Benun asserts that he was never found to be personally violating section 1337 by engaging in infringing conduct.  Thus, he claims, a cease and desist order could not be legitimately issued against him, and the award of civil penalties should be reversed.

---

[6]     Fuji did in fact request modification of the cease and desist and general exclusion orders in the Commission enforcement proceeding to require Jazz to obtain Commission approval before importing any LFFPs.  On appeal Fuji has not challenged the Commission's rejection of this proposed modification.

[7]     See Amgen Inc. v. Int'l Trade Comm'n, 902 F.2d 1532, 1535 (Fed. Cir. 1990) (holding that a Commission finding that a patent did not cover certain products was appealable because it was essentially a final determination not to exclude certain articles from entry); Allied Corp. v. Int'l Trade Comm'n, 782 F.2d 982, 984 (Fed. Cir. 1986) (concluding that Commission invalidity findings can be appealed if they affect the scope of the exclusion order issued by the Commission).

Benun is mistaken as to the scope of the Commission's authority. The Commission plainly had authority to issue an order against Jazz when the Commission found it was infringing Fuji's patents, and it could properly enjoin Jazz's officers, employees, and agents from causing Jazz to engage in future violations. In Wilson v. United States, 221 U.S. 361 (1911), the Supreme Court explicitly noted:

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt.

Id. at 376. Benun contends that this rule is inapplicable in the context of administrative orders because there is no administrative equivalent for Federal Rule of Civil Procedure 65(d), which binds corporate officers to injunctions issued to their corporations. However, in Federal Trade Commission v. Standard Education Society, 302 U.S. 112 (1937), the Federal Trade Commission ("FTC") brought an administrative complaint against two related corporations and three individuals who were the managers and sole stockholders of the corporations and issued a cease and desist order against all of the respondents. The validity of the order was challenged on the grounds that the FTC did not have the power to reach the individual corporate officers. On appeal, the Supreme Court reiterated the rule announced in Wilson and concluded that individuals "who are in charge and control of the affairs of respondent corporation[] would be bound by a cease and desist order rendered [by the FTC] against the corporation[]." Id. at 119. Moreover, in cases under the Federal Trade Commission Act, 15 U.S.C. § 45(b), courts of appeals have consistently upheld the inclusion of corporate officers in FTC cease and

desist orders even when, as here, the administrative complaint and proceedings were directed solely to the corporation and there was no specific statutory authority for the issuance of orders to corporate officers. See Western Fruit Growers Sales Co. v. Fed. Trade Comm'n, 322 F.2d 67, 70 (9th Cir. 1963); Mandel Bros., Inc. v. Fed. Trade Comm'n, 254 F.2d 18, 22 (7th Cir. 1958), rev'd on other grounds, 359 U.S. 385 (1959).

In this case the Commission found that Benun, as Jazz's "principal consultant" and COO, was a decision maker and part of the management team. Benun does not challenge this finding on appeal. Under these circumstances the Commission could legitimately issue a cease and desist order against him.[8]

In addition to arguing that the Commission lacked the authority to issue an order against him, Benun argues that he was not covered by the terms of the cease and desist order. However, the order explicitly stated that it "appl[ied] to [Jazz] and any of its principals, stockholders, officers, directors, employees, agents, licenses [sic], distributors, controlled (whether by stock ownership or otherwise) and/or majority owned business entities, successors, and assigns, and to each of them, insofar as they are engaging in conduct prohibited by Section III, infra, for, with, or otherwise on behalf of [Jazz]." J.A. at 2661-62. Contrary to Benun's argument, this language does not merely

---

[8] The ALJ found that "Benun was principally responsible for the selection of Jazz products, Jazz suppliers, Jazz's refurbishing factories, and the acquisition of empty camera shells." In re Certain Lens-Fitted Film Packages, No. 337-TA-406, 126-27 (Int'l Trade Comm'n Apr. 6, 2004). This is thus not a case where the Commission is trying to impose its order on a corporate officer who had no role in the violation. Some courts have found such attempts improper. See Barrett Carpet Mills, Inc. v. Consumer Prods. Safety Comm'n, 635 F.2d 299, 304 (4th Cir. 1980); Coro v. Fed. Trade Comm'n, 338 F.2d 149, 154 (1st Cir. 1964).

define the scope of people whose conduct would expose Jazz to liability. Instead, it is a command directed to those individuals insofar as they acted in Jazz's behalf.

Benun next argues that "[a]ny attempt to impose significant monetary penalties against Benun when he has not been previously and clearly advised of his potential liability, violates his guarantees of due process under the Fifth Amendment to the United States Constitution." Br. of Appellant Jack Benun at 23. It is well established that "[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not [impose] civil or criminal liability." Gen. Elec. Co. v. U.S. Envtl. Prot. Agency, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). In other words, there must be adequate notice of what conduct is regulated by the order,[9] whose conduct is regulated by the order,[10] and the parameters of any relevant affirmative defenses.[11]

---

[9] See United States v. Hitachi America, Ltd., 172 F.3d 1319, 1331 (Fed. Cir. 1999) (holding that due process prevented the imposition of civil penalties when there was inadequate notice of what declarations were required by Customs); see also United States v. Ford Motor Co., 463 F.3d 1267, 1275-76 (Fed. Cir. 2006) (same); In re Bogese, 303 F.3d 1362, 1368 (Fed. Cir. 2002) ("To be sure, an administrative agency cannot impose a penalty or forfeiture without providing notice." (citing United States v. Chrysler Corp., 158 F.3d 1350, 1354 (D.C. Cir. 1998); Gen. Elec. Co., 53 F.3d at 1329)); County of Suffolk v. First Am. Real Estate Solutions, 261 F.3d 179, 195 (2d Cir. 2001); United States v. Hoechst Celanese Corp., 128 F.3d 216, 224 (4th Cir. 1997); Rollins Envtl. Servs. (NJ) Inc. v. U.S. Envtl. Prot. Agency, 937 F.2d 649, 652 n.2, 654 (D.C. Cir. 1991).

[10] See Hoechst Celanese, 128 F.3d at 224 (holding that the regulations did not provide fair notice as to which factory owners were covered by the reporting requirements).

[11] See Piepenburg v. Cutler, 649 F.2d 783, 787 (10th Cir. 1981); see also Entm't Software Ass'n v. Blagojevich, 404 F. Supp. 2d 1051, 1076 (N.D. Ill. 2005); U.T. Inc. v. Brown, 457 F. Supp. 163, 166 (W.D.N.C. 1978).

In this case, Benun clearly had notice that importing and selling refurbished cameras first sold outside the United States was impermissible. Whether he had adequate notice of the scope of permissible repair is a matter we need not decide. To the extent that Benun challenges the order on this ground, Benun failed to adequately raise this issue in his opening brief. See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006). Instead Benun only argued that the Commission provided insufficient notice that "the cease and desist order issued to respondent Jazz might impose direct liability upon him." Br. of Appellant Jack Benun at 23. This is insufficient to raise the notice issue with respect to the repair defense, and we conclude that the Commission provided adequate notice that Benun's own conduct was subject to the order. As seen above, the cease and desist order extended to principals of Jazz.[12] In that regard, the Commission found that Benun was "legally identified with Jazz and had the power to affect compliance with Jazz's Cease and Desist Order." Lens-Fitted Film Packages at 101-102. Benun has not challenged that finding.

III

Benun argues alternatively that Jazz did not violate the cease and desist order because Jazz's activities constituted permissible repair. Repair is an affirmative defense to a claim of infringement, and Benun, as the party raising the affirmative defense, had the burden of establishing this defense by a preponderance of the evidence. Jazz I, 264 F.3d at 1102. The repair issue is a legal question based on underlying facts. We review the Commission's legal determinations without deference

---

[12]     Benun does not dispute actual notice of the cease and desist order.

and its factual determinations for substantial evidence. See <u>Vanderlande Indus.</u> <u>Nederland BV v. Int'l Trade Comm'n</u>, 366 F.3d 1311, 1317 (Fed. Cir. 2004). "The Supreme Court has taken an expansive view of conduct that constitutes permissible repair of a patented combination of unpatented elements." <u>Sage Prods., Inc. v. Devon Indus., Inc.</u>, 45 F.3d 1575, 1578 (Fed. Cir. 1995).

A

The affirmative defense of repair only applies to products whose patent rights have been exhausted through a first sale in the United States. <u>Jazz I</u>, 264 F.3d at 1105.[13] The Commission concluded that 40% of the LFFPs in issue were first sold abroad and had unexhausted patent rights. This conclusion was supported by substantial evidence. It was based on studies conducted by Fuji's expert that used the identifying numbers printed on the LFFPs and Fuji's production and shipping databases to determine where samples of Fuji-type LFFPs with Jazz packaging (i.e., ones that were refurbished by Jazz) were first sold.

Benun urges that the Commission's decision in this respect was not supported by substantial evidence, primarily arguing that Jazz's so-called informed compliance program required a finding in Jazz's favor. Benun asserts that this program tracked shells from collection through the refurbishment process to sale and insured that only shells collected from the United States were refurbished for sale here. The Commission rejected this argument for two reasons. First, it concluded that the program was too

---

[13] A different rule applies in the copyright context. In <u>Quality King Distributors, Inc. v. L'anza Research International, Inc.</u>, 523 U.S. 135 (1998), the Supreme Court held that "the owner of goods lawfully made under the [Copyright] Act is entitled to the protection of the first sale doctrine in an action in a United States court even if the first sale occurred abroad." <u>Id.</u> at 145 n.14.

disorganized and incomplete to provide credible evidence that Jazz only refurbished shells collected from the United States. Second, the Commission concluded that at most the program could insure that Jazz only refurbished LFFPs <u>collected</u> from the United States, not LFFPs that were first <u>sold</u> here.

Responding to the second ground, Benun urges that proof that Jazz limited its activities to shells collected in the United States was sufficient to prove exhaustion because Fuji "infected the pool" of camera shells collected in the United States by taking actions that made it difficult for Jazz and Benun to insure that these shells were from LFFPs first sold here. These actions allegedly included allowing Kodak to import cameras with Japanese writing on them for sale in the United States; allowing Kodak to import spent shells into the United States for recycling; and allowing tourists to bring cameras first sold abroad into the United States for personal use. Under these circumstances, Benun argues that a presumption should arise that shells collected in the United States were first sold here. However, the Commission found that the number of shells falling into these categories was insignificant, and that finding was supported by substantial evidence. Moreover, there was evidence that Jazz treated substantial numbers of its own shells collected in the United States (the "reloaded reloads") as having been sold in the United States even though it knew that 90% of these shells were first sold abroad (before the first refurbishment).

In any event, the Commission's first ground—that the program was too incomplete and disorganized to be credible—was supported by substantial evidence. Since there was no suggestion that the incomplete and disorganized nature of the

04-1618, 05-1274                    19

program was due to Fuji's actions, this ground alone was sufficient to justify a conclusion that Benun had not carried his burden to prove exhaustion.

Finally, Benun claims that the patent rights were exhausted on the so-called "reloaded reloads," which were cameras refurbished during the relevant period that had previously been collected and refurbished by Jazz a first time prior to August 2001. Fuji was awarded damages in an infringement suit in the District of New Jersey for infringement occurring between 1995 and August 21, 2001. See Fuji I, 394 F.3d at 1372; Jazz II, 439 F.3d at 1347. According to Benun the payment of these damages gave it the right to continued use of the infringing products, i.e., a right to refurbish these cameras a second time after August 21, 2001. We need not decide in this case whether Jazz would have acquired a right to reload cameras a second time upon payment of damages for the first reload. An accused infringer does not acquire an implied license unless it has actually paid full compensation.[14] The entry of an infringement judgment does not in and of itself confer an implied license. See Aro Mfg., 377 U.S. at 499; see also 7 Donald S. Chisum, Chisum on Patents § 20.03[7][b][iii] (2005). Here Benun admits that at the time that Jazz imported the "reloaded reloads" from 2001 to 2003 Jazz had not fully satisfied the New Jersey judgment. See Br. for Appellant Jack Benun at 59 ("Fuji's remedy for [the "reloaded reloads"] is to collect its

---

[14] See Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476, 499 (1964) (distinguishing cases holding that no license arose from the payment of infringement damages in part because "[b]oth cases turned upon the fact that the patentee had not collected on the prior judgment and thus had not received any compensation for the infringing use" (emphasis added)); King Instrument Corp. v. Otari Corp., 814 F.2d 1560, 1564 (Fed. Cir. 1987) ("[T]he District Court has ordered an execution of damages as to the past infringing machine sales. Otari has paid these damages to King in full and hence has received an implied license on those sales." (emphasis added)).

money judgment, a <u>portion</u> of which has already been paid." (emphasis added)). Jazz therefore had not acquired an implied license to reload the cameras a second time.

B

Benun also contends that the Commission erred in concluding that no evidence had been provided of the process used for refurbishing most of the cameras in issue. The Commission found that "there is a lack of complete and credible information verifying the LFFP refurbishing process at many of Jazz's supplier factories" and therefore that Jazz had failed to prove permissible repair for cameras made at these factories. J.A. at 85. The burden was on Benun, as the party seeking to invoke the affirmative defense of repair, to provide "evidence to show that the activities performed in processing the used cameras constituted permissible repair." <u>Jazz I</u>, 264 F.3d at 1102.

Benun argues that the Commission erred in finding the evidence insufficient to show the processes used at many facilities. First, Benun contends that the Commission erroneously held that videotape evidence was essential. We do not read the Commission decision as imposing any such absolute requirement with respect to videotape evidence; it merely held that Benun's videotape evidence in many instances was not authenticated and credited expert testimony that the videotapes were not reliable evidence of what transpired at these factories. Second, Benun asserts that Jazz required its suppliers to use only Jazz-approved processes, but fails to show that he provided any evidence as to what these processes actually involved. Third, Benun relies on Fuji's failure to visit factories until 2003 or identify any patented parts that were replaced, but ignores the fact that Jazz, not Fuji, had the burden of proof. Finally,

Benun points to testimony by several witnesses about how the cameras were refurbished. This testimony was only from employees of Jazz and its suppliers, not disinterested witnesses, and the Commission could properly decline to credit it.

C

Finally, as to some of the cameras, the Commission found that the replacement of the full backs of the cameras involved impermissible reconstruction. Benun contends that these cameras were permissibly repaired. "The application of the law of repair and reconstruction to fact is . . . a legal determination, and is reviewed without deference." Jazz I, 264 F.3d at 1099.

First, contrary to Fuji's assertion, our original decision in Jazz I did not limit the scope of permissible repair to the eight common steps it considered; rather we did not reach the question of what other activities constituted permissible repair. See Jazz I, 264 F.3d at 1109 ("We can not exculpate unknown processes from the charge of infringing reconstruction."). On appeal in this case, the Commission and Benun agree that the eight step refurbishment discussed in Jazz I and the nineteen step refurbishment described in the Commission order here both involve permissible repair. The question then is whether one additional action by Jazz, the addition of a new plastic back cover, converts the activity into impermissible reconstruction.[15]

In Husky Injection Molding Systems Ltd. v. R & D Tool & Engineering Co., 291 F.3d 780 (Fed. Cir. 2002), we concluded that the replacement of a spent part was a

---

[15] This issue arises in the context of an extensive market for refurbishment of the cameras in question. See Sandvik Aktiebolag v. E.J. Co., 121 F.3d 669, 673 (Fed. Cir. 1997) (holding that the existence of a market to manufacture or service spent parts tends to prove that there is a reasonable expectation that the spent parts can be permissibly replaced).

fundamental example of a permissible repair. Id. at 785-86. Benun contends that the back covers were spent parts and their replacement was permissible repair. This is so, he argues, because as a practical matter the backs had to be broken to remove the film, and once new film was inserted the back covers could no longer serve their function of enclosing the camera and keeping light out. The backs therefore were spent and could properly be replaced. Although Fuji did not intend the LFFP to be refurbished, "the patentee's unilateral intent, without more, does not bar reuse of the patented article, or convert repair into reconstruction." Jazz I, 264 F.3d at 1106; Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., 123 F.3d 1445, 1453 (Fed. Cir. 1997).

Benun's factual premise that the backs had to be broken to repair the film is not contested by the Commission on appeal. This court and other tribunals have repeatedly concluded that, in view of the continued utility of the shutter mechanism, lens, viewfinder, film advance mechanism, and other significant parts in the original camera, replacing the film is a permissible repair and reattaching or replacing a part that must be removed or broken to replace the film also constitutes permissible repair. See Jazz I, 264 F.3d at 1106 (reattachment of the back cover); Fuji II, 249 F. Supp. 2d. 434, 446 (D. N.J. 2003), aff'd 394 F.3d 1368 (Fed. Cir. 2005) (removal of the film door that was broken in removing the film); J.A. at 95 (refurbishment of the half backs). Significantly, there is no contention here that the extent of the refurbishment is disproportionate to the overall value of the parts that were not replaced. See Husky, 291 F.3d at 786-87; Jazz I, 264 F.3d at 1106.

In a variety of other contexts we have also held that replacement of a part that must be broken or removed to repair the device does not convert permissible repair into

impermissible reconstruction. For example, in <u>Bottom Line Management, Inc. v. Pan Man, Inc.</u>, 228 F.3d 1352 (Fed. Cir. 2000), we found that "incidental repairs to minor damages" necessary to replace a spent part did not justify a finding of reconstruction. <u>Id.</u> at 1356 (internal quotation marks omitted). In that case studs that held a spent part in place had to be broken in order to remove that part for replacement, and we concluded that replacement of these studs did not justify a finding of reconstruction. <u>Id.</u> at 1355. Similarly, in <u>Everpure, Inc. v. Cuno, Inc.</u>, 875 F.2d 300, 303 (Fed. Cir. 1989), we held that a patentee who designed a product so that the neck which connects a filtering cartridge to the base of the device had to be replaced in order to replace the worn-out cartridge itself could not claim impermissible reconstruction from the replacement of the neck. We concluded that "Everpure and Everpure alone made the business decision to sell disposable cartridges and to render its filter irreplaceable without replacement of the entire cartridge." <u>Id.</u> Likewise, in this case, it would appear that Jazz's actions in replacing the back covers, which must be broken in order to replace the spent film and film cartridge, does not justify a finding of impermissible reconstruction.

The Commission's sole basis for reaching a contrary conclusion was its reliance on an erroneous repair-reconstruction test. The Commission found that by replacing the back cover, Jazz was completely replacing two horizontal ribs that satisfied the "means for exerting force" element of claim 5 of the '495 patent,[16] as well as completely

---

[16]     Claim 5 of the '495 patent states in full:

5. A lens-fitted photographic film package having exposure effecting means and a taking lens comprising:

replacing two other elements of claim 5 (the film and the film cartridge) and partially replacing the fourth element (the light-tight film case). The Commission said, "if a component is integral to a specific patent claim, and it is replaced with a new part, such replacement would weigh heavily towards a finding of reconstruction." J.A. at 94.[17] Here the back cover of the LFFPs was part of a patent directed to a combination of elements; the back cover was not separately patented. The Supreme Court in Aro Manufacturing Co. v. Convertible Top Replacement Co., 365 U.S. 336 (1961) rejected a test for repair/reconstruction that would look to whether an "essential" or "distinguishing" part of the patented combination had been replaced. Id. at 345. In doing so, the Court concluded "that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant" and "that there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent." Id. at 344-45. We see no material difference between the Commission's test that focused on whether an "integral" component has been replaced, and the tests previously rejected by the Supreme Court that focus on whether an

---

a light-tight film case which must be destroyed to open the same;

a film which is formed in a roll and contained in a film roll chamber of said light-tight film case;

a film container received in said light-tight film case into which said film, after exposure, is advanced frame by frame and wound in a roll; and

means to exert a frictional force on said film upon said film being advanced.

[17] Applying this same test, the ALJ concluded that the 998,250 half backs sold in 2003 were permissibly repaired because it was unclear whether the new ribs they received satisfied the "means for exerting force" element. Neither Benun nor the Commission challenges this finding on appeal.

"essential" or "distinguishing" part, or part that is at the "gist" or "heart" of the invention, has been replaced. See Husky, 291 F.3d at 787 (noting that the Supreme Court has "eschewed the suggestion that the legal distinction between 'reconstruction' and 'repair' should be affected by whether the element of the combination that has been replaced is an 'essential' or 'distinguishing' part of the invention" (quoting Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 217 (1980))). Moreover, the Commission's test is not in accord with our earlier decision in Jazz I itself. Two of the eight steps found by this court to be permissible repair in that decision likewise replaced elements of claim 5 of the '495 patent—the film and the film cartridge. 264 F.3d at 1098.

Thus, we conclude that the Commission erred in holding that the cameras in which full backs were replaced were impermissibly reconstructed; we hold that the replacement of the full backs was part of a permissible repair. We accordingly remand to the Commission for the limited purpose of considering an appropriate adjustment in the amount of civil penalties in light of our holding that the 998,250 LFFPs refurbished by replacing the full backs were permissibly repaired.

CONCLUSION

For the foregoing reasons, we conclude that Fuji lacked standing to bring this appeal. We further conclude that the Commission had the power to impose civil penalties on Benun; that the cease and desist order applied to Benun; that the order provided adequate notice that Benun was covered; and that the Commission did not err in concluding that most of the LFFPs were impermissibly reconstructed. However, we conclude that the Commission did err in holding that the replacement of the full backs of LFFPs was impermissible reconstruction.

<u>AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED</u>

COSTS

No costs.